# COLEMAN LAW FIRM

RONALD D. COLEMAN*
JANE COLEMAN†
CHARLES E. JOSEPH†
NANCY EXUMÉ
PETER S. FRIEDMAN
DAVID MARC NIEPORENT

*OF COUNSEL TO GIBNEY, ANTHONY & FLAHERTY, LLP
665 FIFTH AVENUE  NEW YORK, NY 10022

†ADMITTED IN NEW YORK ONLY - OF COUNSEL

THE DIAMOND BUILDING
881 ALLWOOD ROAD
CLIFTON, NEW JERSEY 07012

973-471-4010
FAX 973-471-4646

July 10, 2003

**VIA OVERNIGHT MAIL**

Walter Towers
Clerk
United States District Court
District of New Jersey, Newark Division
50 Walnut Street
Newark, New Jersey 07101

> Re: In the Matter of the Application for Discovery for use in proceedings before the English High Court of Justice between <u>Mohammed Al Amoudi and Hussein Abdullah Kassim Et Al.</u>

Dear Mr. Towers:

Enclosed please find an original and two (2) copies of Plaintiff's Motion, proposed Order and Memorandum of Law in Support of the Application, and two copies of a Declaration in Support of the Application. This is a time-sensitive matter, so we would greatly appreciate your earliest attention. Please return stamped copies via the self-addressed, stamped FedEx envelope I have provided.

Per your instructions, a check in the amount of $30 is included for the filing fee. If there are any questions about this matter, please do not hesitate to contact me.

Very truly yours,

David Marc Nieporent

Enc.

cc: Rosena Rasalingam

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY



**COLEMAN LAW FIRM**
Ronald D. Coleman (RC-3875)
David M. Nieporent (DN-9400)
881 Allwood Road
Clifton, New Jersey   07012
(973) 471-4010
Attorneys for Claimant
Mohammed Al Amoudi

Torys LLP
Steven R. Schoenfeld (SS 9181)
Rosena P. Rasalingam (RR 5716)
237 Park Avenue
New York, New York   10017
(212) 880-6000
Attorneys for Claimant
Mohammed Al Amoudi

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR DISCOVERY FOR USE IN PROCEEDINGS BEFORE THE ENGLISH HIGH COURT OF JUSTICE BETWEEN MOHAMMED AL AMOUDI,<br><br>CLAIMANT,<br><br>- AND -<br><br>HUSSEIN ABDULLAH KASSIM ET AL., DEFENDANTS, CLAIM Nos. HC02C02379 and HC02C01245. | MISC CIVIL ACTION NO. 03-232 (JAP)<br><br>**MOTION FOR DISCOVERY ORDER** |

### PLAINTIFF'S MOTION FOR DISCOVERY ORDER

Plaintiff Mohammed AL Moudi, pursuant to 28 U.S.C. §
1782 and Rules 30 and 45 of the Federal Rules of Civil

Procedure, moves the court to:

A. Issue subpoenas to persons residing in or who can be found in this judicial district that command those persons to appear at depositions upon oral examination and to produce and permit inspection and copying of documents for use in proceedings pending before the English High Court in London, England, namely <u>Mohammed Al Amoudi v. Hussein Abdullah Kassim et al</u>. (Claim No. HC02C02379) and <u>Mohammed Al Amoudi v. Hiwot Habte et al</u>. (Claim No. HC02C01245).

B. Appoint plaintiff's attorneys Coleman Law Firm to issue and sign such additional subpoenas to persons residing in or who can be found in this judicial district as may be needed for discovery for use in the English proceedings.

The facts underlying this motion are verified by the declaration filed herewith, and Plaintiff submits the following documents in support of its motion:

1. (Proposed) Order for discovery

2. Memorandum of Law in Support of Plaintiff's Motion

3. Declaration of Thomas H. Webster

2

Dated: July 10, 2003

By: _Dul M Nypt_

Coleman Law Firm
Ronald D. Coleman (RC-3875)
David M. Nieporent (DN-9400)
881 Allwood Road
Clifton, NJ  07012
(973) 471-4010
Attorneys for the Claimant
Mohammed Al Amoudi

3

#2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------------------------------ x

IN THE MATTER OF THE APPLICATION FOR :
DISCOVERY FOR USE IN PROCEEDINGS BEFORE
THE ENGLISH HIGH COURT OF JUSTICE BETWEEN

MOHAMMED AL AMOUDI,

                 Claimant,

          - AND -

HUSSEIN ABDULLAH KASSIM ET AL.,
DEFENDANTS, CLAIM Nos. HC02C02379 and
HC02C01245.

------------------------------------------------------------------------ x

**FILED**

**JUL 1 4 2003**

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

MISC
~~Civ.~~ Action No. 03-232(JAP)

:

:

:

:

:

**Declaration of Thomas H. Webster, Esq. In Support of the Application of Mr. Al Amoudi For Discovery For Use In English Court Proceedings**

       Thomas H. Webster, Esq. declares under penalty of perjury under the laws of the United States of America that the following is true and correct.

1.      I am counsel to the firm of Gravel, Otto & Associés in its offices at 32 Avenue de l'Opéra, Paris 75002 France. I am an Attorney-at-law (New York), Solicitor (England), and Avocat (France) and have represented the applicant, Mr. Al Amoudi, in connection with the English proceedings described below and related matters. I submit this declaration in support of Mr. Al Amoudi's application for an order, pursuant to 28 U.S.C. § 1782 and Rules 30 and 45 of the Federal Rules of Civil Procedure, issuing subpoenas to various persons residing in or who can be found in this district and directing those persons to appear for depositions and produce documents for inspection and copying for use in proceedings currently pending before the English High Court.

## **EXHIBIT A**

### **The Kassim English action**

**1.** Re-Amended Claim form dated 14 May 2003 (claim no. HC02C02379).

**2.** Re-re-Amended Particulars of claim dated 14 May 2003 (claim no. HC02C02379).

**1.** Re-Amended Claim form dated 14 May 2003 (claim no. HC02C02379).



# Claim Form

Amended Claim form by Order of Mr
Justice Tomlinson dated 18 September 2002

Re-Amended Claim form by Order
of the Honourable Mr Justice
River dated 14 May 2003

**In the**   High Court of Justice
Chancery Division

| | for court use only |
|---|---|
| **Claim No.** | HC02C02379 |
| **Issue Date** | ~~19 September 2002~~ **15 May 2003** |

**Claimant(s)**
Sheikh Mohammed Al Amoudi

1 7 JAN 2001

16 MAY 2003
CHANCERY CHAMBERS

**Defendant(s)**
(1) Hussein Abdullah Kassim
(2) Tamrat Layne
(3) Chadia Nadim Kassim
(4) Negusse Hailu
(5) Barclays Bank Plc
(6) Tigist Hailu
(7) The HAK and Ezaharia Trusts
(8) Ramiss International Limited
(9) Hanzalamu Private Limited Company
**(10) Mourad Ibrahim**
**(11) Credit Agricole Indosuez**

**Brief details of claim**

(1) The Claimant's claim against the First to Fourth and Sixth to ~~Ninth~~**Tenth** Defendants arises in connection with:

(1.1) A judgment of the Ethiopian Federal Supreme Court made 14 March 2000 in the matter of Ethiopia v Tamrat Layne et al, Case No 1/89 (the "Judgment"), ordering payment to the Claimant in the following amounts:

| | | |
|---|---|---|
| (a) | by the First Defendant | US$6,443,447.95 |
| (b) | by the Third Defendant | US$9,000,000 |
| (c) | by the Fourth Defendant | US$556,324.05 |

(1.2) The transfer of US$16 million by the Claimant to the First Defendant in England on 10 April 1995 induced by misrepresentations by the Second Defendant to the Claimant in Ethiopia on 5 April 1995; the misappropriation of the US$16 million by the First Defendant; and/or the subsequent transmission of all or part of this US$16 million to the Second, Third, Fourth, Sixth, Seventh, Eighth ~~and~~, Ninth **and Tenth** Defendants in Djibouti, Switzerland, England and elsewhere.

(2) The Claimant claims against the First, Third and Fourth Defendants the following sums representing monies due and owing under the Judgment:

(a) by the First Defendant     US$6,443,447.95
(b) by the Third Defendant     US$9,000,000
(c) by the Fourth Defendant     US$556,324.05

**Value**
The Claimant wishes its claim to be issued in the High Court as it expects to recover more than £15,000

**Defendant's name and address**

9,882,643.80

| | |
|---|---|
| Defendants' names and addresses: See Schedule on page four | |

| | |
|---|---|
| Amount Claimed | ~~£10,329,244.67~~ plus interest |
| Court Fee | £620 |
| Solicitor's costs | £190 |
| Total amount | ~~£10,330,054.67~~ 9,883,453.60 |

The court office at     is open between 10 am and 4 pm (4.30 pm in High Court) Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

# Particulars of Claim

(3) Further or in the alternative, the Claimant claims against the First, Second, Third, Fourth, **Sixth**, Seventh, and Eighth Defendants:

(3.1)  (a)    A declaration that they hold on trust and or constructive trust for the Claimant the sum of US$16 million, or alternatively such monies as have been received pursuant to the transmission referred to in paragraph 1.2 herein, and

        (b)    An Order that they should pay the Claimant the sum of US$16 million, or alternatively such monies as have been received pursuant to the transmissions referred to in paragraph 1.2 herein;

(3.2)  Further or in the alternative, damages for:

        (a)    deceit, and
        (b)    conspiracy to defraud

in connection with the transmissions referred to in paragraph 1.2 above;

(3.3)  Money had and received in respect of the US$16 million, or alternatively such monies as have been received pursuant to the transmissions referred to in paragraph 1.2 herein;

(3.4)  Interest on all sums claimed at the rate of 8% per annum pursuant to section 35A of the Supreme Court Act 1981 at the daily rate of US$3,506.85; and

(3.5)  Such further orders, directions, accounts and enquiries as may be required.

(3.6)  The Claimant claims against the Sixth~~and~~, Ninth **and Tenth** Defendants:

        (a)    to trace in law and/or in equity such monies as have been paid to them pursuant to the transfers referred to in paragraph 1.2 above;

        (b)    interest pursuant to s35A of the Supreme Court Act 1981 and/or in equity;

        (c)    such further orders, directions, accounts and enquiries as may be required.

(4)  The Claimant's claim against the Fifth Defendant ("Barclays") is for orders that:

(4.1)  it discloses the following information in relation to all accounts which are or have been at any time since 1 March 1995 held by the First, Fourth and Sixth Defendants at Barclays, whether the accounts are held in the Defendants' names or not, and whether the Defendants are solely, jointly or beneficially entitled to the monies in those accounts at Barclays:-

        (a)    the name of the account;
        (b)    the account number;
        (c)    the names of authorised signatories for the account

(continued on separate page)

| Claim No. | HC02C02379 |
|-----------|------------|

Does, or will, your claim include any issues under the Human Rights Acts 1998   ☐ Yes ☒ No

# Particulars of Claim

Details of the Claimant's claim (continued)

(4.2)   Barclays permits the Claimant to inspect and take copies of:-
     (a)   all entries in the books and all records and files held (whether held in documentary or electronic form) relating to any accounts of the sort referred to in paragraph (4.1) above;
     (b)   all correspondence between Barclays and the First, Fourth and Sixth Defendants or correspondence with third parties relating to such Defendants; and
     (c)   all cheques drawn on any account of the sort referred to in paragraph 4.1 above;
     (d)   all debit vouchers, transfer applications and orders and internal memoranda relating to any account of the sort referred to in paragraph (4.1) above;
     (e)   copies of statements for any accounts of the sort referred to in paragraph (4.1) above (whether the statements are stored by Barclays in paper form, or must be recovered from computer records and/or microfiche);
from the date of opening the account to the date of inspection by the Claimant.

**(5)**   **The Claimant's claim against the Eleventh Defendant ("Credit Agricole") is for orders that:**

**(5.1)**   **it discloses the following information in relation to all accounts which are or have been held at any time since 1 March 1995 by or in the name of the First Defendant at Credit Agricole (or at its predecessor Banque Indosuez) whether such accounts are/were held in the First Defendant's sole name or jointly:-**

     **(a)**   **the name of the account;**
     **(b)**   **the account number;**
     **(c)**   **the names of authorised signatories for the account**

**(5.2)**   **Credit Agricole permits the Claimant to inspect and take copies of:-**
     **(a)**   **all entries in the books and all records and files held (whether in documentary or electronic form) relating to any accounts held at any time since 1 March 1995 by or in the name of the First Defendant at Credit Agricole (including its subsidiaries, predecessors and affiliates) whether such accounts are held in the First Defendant's sole name or jointly;**
     **(b)**   **all correspondence between Credit Agricole and the First Defendant and between Credit Agricole and third parties regarding the First Defendant;**
     **(c)**   **all cheques drawn on any account of the sort referred to in paragraph 1 above;**
     **(d)**   **all debit vouchers, transfer applications and orders and internal memoranda relating to any account of the sort referred to in paragraph 1 above;**
     **(e)**   **copies of statements for any of the accounts of the sort referred to in paragraph 1 above (whether the statements are stored by Credit Agricole in paper form, or must be recovered from computer records and/or microfiches);**
     **(f)**   **all documents relating to any trusts, entities or offshore deposits organised or introduced by Credit Agricole, including all correspondence with respect thereto**
**as from the date of the opening of the account to the date of inspection by the Claimant and to include documents in the above categories relating to or emanating from any private banking services provided to the First Defendant.**

## Particulars of Claim

**(6)**    **The** claims against the First, Second, Third, Fourth and ~~Sixth~~ **Seventh** to Ninth Defendants are claims for payment in United States dollars, as it was in that currency that the Claimant transferred US$16 million to the First Defendant, which forms the basis for the claims in paragraph 3, and the judgment of the Ethiopian Federal Supreme Court, which forms the basis for the claims in paragraph (2), is expressed in that currency. **Although the claims against the Sixth and Tenth Defendants are claims for payment in both United States dollars and sterling, the ultimate currency of loss is United States dollars.** The rate current in London for the purchase of United States dollars at the close of business on ~~18 September 2002~~**14 May 2003** was US$~~1.549~~ **1.619** to the pound sterling **(as reported in The Financial Times, 15 May 2003)**. At this rate, the sterling equivalent of US$16 million is £~~10,329,244.67~~ **9,882,643.60**.

Statement of Truth

* The Claimant believes that the facts stated in this claim form are true.

* I am duly authorised by the Claimant(s) to sign this statement

Full name      Marie Lisa Kidwell

Name of Claimant's solicitor's firm      Hunton & Williams

signed      *Alliwell*      position or office held      Solicitor

*      (if signing on behalf of firm or company)

*delete as appropriate

---

Hunton & Williams
Fleetway House
25 Farringdon Street
London EC4A 4AB
Ref: MLK/KRS/63189.000002
Tel:      020 7246 5700
Fax:      020 7246 5772
mkidwell@hunton.com

Claimant's or Claimant's solicitor's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail

## SCHEDULE

Addresses of the Defendants

First Defendant:      Hussein Abdullah Kassim
Flat 54
Gilbey House
38 Jamestown Road
London NW1

Second, Third and Fourth Defendants:      Tamrat Layne
Chadia Nadim Kassim
Negusse Hailu
Addis Ababa Prison Administration
Addis Ababa
Ethiopia

Fifth Defendant:      Barclays Bank plc

# Particulars of Claim

.                                                54 Lombard Street
                                                 London EC3P 3AH

Sixth Defendant:                                 Tigist Hailu
                                                 Apartment 14L
                                                 1320 New York Avenue
                                                 New York 10021
                                                 USA

Seventh Defendant:                               The HAK and Ezhaharia Trusts
                                                 c/o Barclaytrust Suisse
                                                 10-12 Rue d'Italie
                                                 Geneva 12
                                                 Switzerland

Eighth Defendant:                                Ramiss International Limited
                                                 Woreda 18
                                                 Kebele 27
                                                 House Number 301
                                                 **Addis Ababa**
                                                 Ethiopia

Ninth Defendant:                                 Hazalamu Private Limited Company
                                                 Woreda 18
                                                 Kebele 37
                                                 House Number 001
                                                 **Addis Ababa**
                                                 Ethiopia

**Tenth Defendant:**                             **Mourad Ibrahim**
                                                 **Woreda 03**
                                                 **Kebele 52**
                                                 **House No. 072**
                                                 **Addis Ababa**
                                                 **Ethiopia**

**Eventh Defendant:**                            **Credit Agricole Indosuez**
                                                 **122 Leadenhall Street**
                                                 **London EC3V 4PT**

# Notes for claimant on completing a claim form

### Further information may be obtained from the court in a series of free leaflets.

- Please read all of these guidance notes before you begin completing the claim form. The notes follow the order in which information is required on the form.
- Court staff can help you fill in the claim form and give information about procedure once it has been issued. But they cannot give legal advice. If you need legal advice, for example, about the likely success of your claim or the evidence you need to prove it, you should contact a solicitor or a Citizens Advice Bureau.
- If you are filling in the claim form by hand, please use black ink and write in block capitals.
- Copy the completed claim form and the defendant's notes for guidance so that you have one copy for yourself, one copy for the court and one copy for each defendant. Send or take the forms to the court office with the appropriate fee. The court will tell you how much this is.

# Notes on completing the claim form

## Heading

You must fill in the heading of the form to indicate whether you want the claim to be issued in a county court or in the High Court (The High Court means either a District Registry (attached to a county court) or the Royal Courts of Justice in London). There are restrictions on claims which may be issued in the High Court (see 'Value' overleaf).

Use whichever of the following is appropriate:

'In the ..........................County Court'
(inserting the name of the court)

**or**

'In the High Court of Justice.........................Division'
(inserting eg. 'Queen's Bench' or 'Chancery' as appropriate)
'.............................District Registry'
(inserting the name of the District Registry)

**or**

'In the High Court of Justice.........................Division,
(inserting eg. 'Queen's Bench' or 'Chancery' as appropriate)
Royal Courts of Justice'

## Claimant and defendant details

As the person issuing the claim, you are called the 'claimant'; the person you are suing is called the 'defendant'. Claimants who are under 18 years old (unless otherwise permitted by the court) and patients within the meaning of the Mental Health Act 1983, must have a litigation friend to issue and conduct court proceedings on their behalf. Court staff will tell you more about what you need to do if this applies to you.

You must provide the following information about yourself **and** the defendant according to the capacity in which you are suing and in which the defendant is being sued. When suing or being sued as:-

**an individual:**

All known forenames and surname, whether Mr, Mrs, Miss, Ms or Other (e.g. Dr) and residential address **(including** postcode and telephone number) in England and Wales. Where the defendant is a proprietor of a business, a partner in a firm or an individual sued in the name of a club or other unincorporated association, the address for service should be the usual or last known place of residence **or** principal place of business of the company, firm or club or other unincorporated association.

**Where the individual is:**

**under 18** write '(a child by Mr Joe Bloggs his litigation friend)' after the name. If the child is conducting proceedings on their own behalf write '(a child)' after the child's name.

**a patient within the meaning of the Mental Health Act 1983** write '(by Mr Joe Bloggs his litigation friend)' after the patient's name.

**trading under another name**

you must add the words 'trading as' and the trading name e.g. 'Mr John Smith trading as Smith's Groceries'.

**suing or being sued in a representative capacity**

you must say what that capacity is e.g. 'Mr Joe Bloggs as the representative of Mrs Sharon Bloggs (deceased)'.

**suing or being sued in the name of a club or other unincorporated association**

add the words 'suing/sued on behalf of' followed by the name of the club or other unincorporated association.

**a firm**

enter the name of the firm followed by the words 'a firm' e.g. 'Bandbox - a firm' and an address for service which is either a partner's residential address or the principal or last known place of business.

**a corporation (other than a company)**

enter the full name of the corporation and the address which is either its principal office **or** any other place where the corporation carries on activities and which has a real connection with the claim.

**a company registered in England and Wales**

enter the name of the company and an address which is either the company's registered office **or** any place of business that has a real, or the most, connection with the claim e.g. the shop where the goods were bought.

**an overseas company (defined by s744 of the Companies Act 1985)**

enter the name of the company and either the address registered under s691 of the Act **or** the address of the place of business having a real, or the most, connection with the claim.

## Brief details of claim

**Note: The facts and full details about your claim and whether or not you are claiming interest, should be set out in the 'particulars of claim' (see note under 'Particulars of Claim').**

You must set out under **this** heading:

- a concise statement of the nature of your claim
- the remedy you are seeking e.g. payment of money; an order for return of goods or their value; an order to prevent a person doing an act; damages for personal injuries.

## Value

If you are claiming a **fixed amount of money** (a 'specified amount') write the amount in the box at the bottom right-hand corner of the claim form against 'amount claimed'.

If you are <u>not</u> claiming a fixed amount of money (an 'unspecified amount') under 'Value' write "I expect to recover" followed by whichever of the following applies to your claim:

- "not more than £5,000" **or**
- "more than £5,000 but not more than £15,000"**or**
- "more than £15,000"

If you are **not able** to put a value on your claim, write "I cannot say how much I expect to recover".

**Personal injuries**

If your claim is for 'not more than £5,000' and includes a claim for personal injuries, you must also write "My claim includes a claim for personal injuries and the amount I expect to recover as damages for pain, suffering and loss of amenity is" followed by either:

- "not more than £1,000" **or**
- "more than £1,000"

**Housing disrepair**

If your claim is for 'not more than £5,000' and includes a claim for housing disrepair relating to residential premises, you must also write "My claim includes a claim against my landlord for housing disrepair relating to residential premises. The cost of the repairs or other work is estimated to be" followed by either:

- "not more than £1,000" **or**
- "more than £1,000"

If within this claim, you are making a claim for other damages, you must also write:

"I expect to recover as damages" followed by either:

- "not more than £1,000" **or**
- "more than £1,000"

## Issuing in the High Court

You may only issue in the High Court if one of the following statements applies to your claim:-

"By law, my claim must be issued in the High Court.
The Act which provides this is ................(specify Act)"

**or**

"I expect to recover more than £15,000"

**or**

"My claim includes a claim for personal injuries and the value of the claim is £50,000 or more"

**or**

"My claim needs to be in a specialist High Court list, namely.................................(state which list)".

If one of the statements does apply and you wish to, or must by law, issue your claim in the High Court, write the words "I wish my claim to issue in the High Court because" followed by the relevant statement e.g. "I wish my claim to issue in the High Court because my claim includes a claim for personal injuries and the value of my claim is £50,000 or more."

## Defendant's name and address

Enter in this box the full names and address of the defendant receiving the claim form (ie. one claim form for each defendant). If the defendant is to be served outside England and Wales, you may need to obtain the court's permission.

## Particulars of claim

You may include your particulars of claim on the claim form in the space provided or in a separate document which you should head 'Particulars of Claim'. It should include the names of the parties, the court, the claim number and your address for service and also contain a statement of truth. You should keep a copy for yourself, provide one for the court and one for each defendant. Separate particulars of claim can either be served

- with the claim form **or**
- within 14 days after the date on which the claim form was served.

If your particulars of claim are served separately from the claim form, they must be served with the forms on which the defendant may reply to your claim.

**Your particulars of claim must include**

- a concise statement of the facts on which you rely
- a statement (if applicable) to the effect that you are seeking aggravated damages or exemplary damages
- details of any interest which you are claiming
- any other matters required for your type of claim as set out in the relevant practice direction

## Address for documents

Insert in this box the address at which you wish to receive documents and/or payments, if different from the address you have already given under the heading 'Claimant'. The address must be in England or Wales. If you are willing to accept service by DX, fax or e-mail, add details.

## Statement of truth

This must be signed by you, by your solicitor or your litigation friend, as appropriate.

Where the claimant is a registered company or a corporation the claim must be signed by either the director, treasurer, secretary, chief executive, manager or other officer of the company or (in the case of a corporation) the mayor, chairman, president or town clerk.

**Please read these notes carefully - they will help you decide what to do about this claim.
Further information may be obtained from the court in a series of free leaflets**

- If this claim form was received with the particulars of claim completed or attached, you must reply within 14 days of the date it was served on you. If the words 'particulars of claim to follow' are written in the particulars of claim box, you should not reply until after you are served with the particulars of claim (which should be no more than 14 days after you received the claim form). If the claim was sent by post, the date of service is taken as the second day after posting (see post mark). If the claim form was delivered or left at your address, the date of service will be the day after it was delivered.
- You may either
    - pay the total amount i.e. the amount claimed, the court fee, and solicitor's costs (if any)
    - admit that you owe all or part of the claim and ask for time to pay or
    - dispute the claim
- If you do not reply, judgment may be entered against you.
- The notes below tell you what to do.
- The response pack will tell you which forms to use for your reply. (The pack will accompany the particulars of claim if they are served after the claim form).
- Court staff can help you complete the forms of reply and tell you about court procedures. But they cannot give legal advice. If you need legal advice, for example about the likely success of disputing the claim, you should contact a solicitor or a Citizens Advice Bureau immediately.

**Registration of Judgments:** If this claim results in a judgment against you, details will be entered in a public register, the Register of County Court Judgments. They will then be passed to credit reference agencies which will then supply them to credit grantors and others seeking information on your financial standing. **This will make it difficult for you to get credit.** A list of credit reference agencies is available from Registry Trust Ltd, 173/175 Cleveland Street, London W1T 6QR.

**Costs and Interest:** Additional costs and interest may be added to the amount claimed on the front of the claim form if judgment is entered against you. In a county court, if judgment is for £5,000 or more, or is in respect of a debt which attracts contractual or statutory interest for late payment, the claimant may be entitled to further interest.

## Your response and what happens next

### How to pay

Do not bring any payments to the court - they will not be accepted.

When making payments to the claimant, quote the claimant's reference (if any) and the claim number.

Make sure that you keep records and can account for any payments made. Proof may be required if there is any disagreement. It is not safe to send cash unless you use registered post.

### Admitting the Claim

#### Claim for specified amount

**If you admit all the claim,** take or send the money, including the court fee, any interest and costs, to the claimant at the address given for payment on the claim form, within 14 days.

**If you admit all the claim and you are asking for time to pay,** complete Form N9A and send it to the claimant at the address given for payment on the claim form, within 14 days. The claimant will decide whether to accept your proposal for payment. If it is accepted, the claimant may request the court to enter judgment against you and you will be sent an order to pay. If your

offer is not accepted, the court will decide how you should pay.

**If you admit only part of the claim,** complete Form N9A and Form N9B (see 'Disputing the Claim' overleaf) and send them to the court within 14 days. The claimant will decide whether to accept your part admission. If it is accepted, the claimant may request the court to enter judgment against you and the court will send you an order to pay. If your part admission is not accepted, the case will proceed as a defended claim.

#### Claim for unspecified amount

**If you admit liability for the whole claim but do not make an offer to satisfy the claim,** complete Form N9C and send it to the court within 14 days. A copy will be sent to the claimant who may request the court to enter judgment against you for an amount to be decided by the court, and costs. The court will enter judgment and refer the court file to a judge for directions for management of the case. You and the claimant will be sent a copy of the court's order.

**If you admit liability for the claim and offer an amount of money to satisfy the claim,** complete Form

## Notes for defendant on replying to the claim form (Consumer Credit Act claim)

**Please read these notes carefully - they will help you decide what to do about this claim. You will have received a notice of hearing telling you when and where to come to court with the claim form. A leaflet is available from the court office about what happens when you come to a court hearing.**

- You must reply to the claim form within 14 days of the date it was served on you. If the claim form was
    - sent by post, the date of service is taken as the second day after posting (see post mark)
    - delivered or left at your address, the date of service will be the day after it was delivered
    - handed to you personally, the date of service will be the day it was given to you
- You may either
    - pay the amount claimed
    - admit liability for the claim and offer to make payments to keep the goods
    - dispute the claim
- If you do not reply or attend the hearing, judgment may be entered against you.
- The notes below tell you what to do .
- Court staff can help you complete the forms of reply and tell you about court procedure. But they cannot give legal advice. If you need legal advice, for example about the likely success of disputing the claim, you should contact a solicitor or a Citizens Advice Bureau immediately.

**Registration of Judgments:** If this claim results in a judgment against you, details will be entered in a public register, the Register of County Court Judgments. They will then be passed to credit reference agencies which will then supply them to credit grantors and others seeking information on your financial standing. **This will make it difficult for you to get credit.** A list of credit reference agencies is available from Registry Trust Ltd, 173/175 Cleveland Street, London W1T 6QR.

**Costs and Interest:** Additional costs and interest may be added to the amount claimed on the front of the claim form if judgment is entered against you. In a county court, if judgment is for £5,000 or more, or is in respect of a debt which attracts contractual or statutory interest for late payment, the claimant may be entitled to further interest.

# Your response and what happens next

## How to pay

Do not bring any payments to the court - they will not be accepted.

When making payments to the claimant, quote the claimant's reference (if any) and the claim number.

Make sure that you keep records and can account for any payments made. Proof may be required if there is any disagreement. It is not safe to send cash unless you use registered post.

## Admitting the Claim

**If you admit liability for the claim and offer to make payments in order to keep the goods.** Complete Form N9C and send it to the court within 14 days. **Remember** to keep a copy for yourself. The court will send a copy of your admission to the claimant and ask if your offer is acceptable.

If the claimant **accepts your offer** and asks the court to enter judgment before the date of the hearing, you will be sent a copy of the judgment and need not come to the hearing. If you do not hear from the court it is in your interests to attend the hearing.

If your offer is **not accepted**, you should attend the hearing. The court will treat your admission as evidence so remember to bring a copy of your admission with you to the hearing.

## Disputing the claim

**If you dispute the claim or wish to claim against the claimant (counterclaim),** complete Form N9D and send it to the court within 14 days. **Remember** to keep a copy for yourself and to bring it with you to the hearing. The court will send a copy of your defence to the claimant. At the hearing the court may make a final order or judgment in the claim. If the court agrees that you have a valid defence (or counterclaim), it will tell you and the claimant what to do to prepare for a future hearing. If you send your defence to the court after the 14 days has expired, and you want to rely on it at the hearing, the court may take your failure to file it on time into account when deciding what order to make in respect of costs.

## Statement of truth

This must be signed by you, by your solicitor or your litigation friend, as appropriate.

Where the defendant is **a registered company or a corporation** the response must be signed by either the director, treasurer, secretary, chief executive, manager or other officer of the company **or** (in the case of a corporation) the mayor, chairman, president or town clerk.

**2.** Re-re-Amended Particulars of claim dated 14 May 2003 (claim no. HC02C02379).

Amended Particulars of Claim by Order of Master Rose dated 19 December 2001

Re-Amended Particulars of Claim by Order of Mr Justice Tomlinson dated 18 September 2002

Re-Re-Amended Particulars of Claim by Order of Mr Justice Rimer dated 14 May 2003

**IN THE HIGH COURT OF JUSTICE**   **CLAIM NO.HC02C02379**

**CHANCERY DIVISION**

**BETWEEN:**

### SHEIKH MOHAMMED AL AMOUDI

**Claimant**

**-and-**

### (1) HUSSEIN ABDULLAH KASSIM

**First Defendant**

### (2) TAMRAT LAYNE

**Second Defendant**

### (3) CHADIA NADIM KASSIM

**Third Defendant**

### (4) NEGUSSE HAILU

**Fourth Defendant**

### (5) BARCLAYS BANK PLC

**Fifth Defendant**

### (6) TIGIST HAILU

**Sixth Defendant**

### (7) THE HAK AND EZHAHARIA TRUSTS

**Seventh Defendant**

### (8) RAMISS INTERNATIONAL LIMITED

**Eighth Defendant**

### (9) HANZALAMU PRIVATE LIMITED COMPANY

**Ninth Defendant**

### (10) MOURAD IBRAHIM

**Tenth Defendant**

### (11) CREDIT AGRICOLE INDOSUEZ

**Eleventh Defendant**

---

**RE-RE-AMENDED PARTICULARS OF CLAIM**

CHANCERY DIVISION
RECEIVED

3 MAY 2003

The Relevant Parties and Entities

1.1     1.1     The Claimant ("Sheikh Al Amoudi"):

        1.1.1     was born in Ethiopia in 1946;

        1.1.2     is and was at all relevant times:

            (1)     a citizen of, and resident in, Saudia Arabia;

            (2)     the individual behind MIDROC Ethiopia, a group which comprises about 18 companies, and has interests in diverse areas including the agro-industrial sector, car sales, mining, and the pharmaceutical industry;

        1.1.3     is reputed to be the largest foreign investor in Ethiopia;

1.2     Sheikh Al Amoudi has known the Second Defendant since about early 1992.

1.3     Sheikh Al Amoudi at all relevant times held an account of number 107476/001/12 ("Sheikh Al Amoudi's ABN Amro Account") at the branch of ABN Amro in Geneva ("ABN Amro Geneva").

2.     The First Defendant ("Mr Kassim"):

2.1     is the son of the Third Defendant;

2.2     held the following accounts:

        2.2.1     from about 26 October 1993 until about 19 November 1994 an account number 80540218 at the branch of the Fifth Defendant ("Barclays") located at Virginia Water, Surrey (sort code 20-89-48);

        2.2.2     from about 19 November 1994 to about 26 April 1995 an account of number 60540218 ("the Account at Barclays, Ascot") at the branch of Barclays, in Ascot, Berkshire SL5 7LB (sort code 20-02-53) ("Barclays, Ascot Branch");

2.2.3    from about 26 April 1995 an account of number 00254703 (renumbered 20254703) at a branch of Barclays (of sort code 20-45-48) in Kensington, London W8 ("Mr Kassim's Kensington Account");

2.2.3A   a US dollar current account number 82059600 at Barclays in Kensington but with sort code 20-47-34;

2.2.4    an account number 059478/001 at Barclays Finance Company Jersey with sort code 23-45-00 ("Mr Kassim's Jersey Account");

2.25     an account at Credit Agricole Indosuez (formerly Banque Indosuez) in London;

2.26     an account number 1052018M at Credit Agricole Indosuez (formerly Banque Indosuez) in Geneva.

3.    The Second Defendant ("Tamrat Layne"):

3.1    was the Prime Minister of Ethiopia between May 1991 and August 1995; and

3.2    was Deputy Prime Minister of Ethiopia and Minister of Defence from August 1995 until 23 October 1996.

4.    4.1    The Third Defendant ("Chadia Kassim"):

4.1.1   was the mistress of Tamrat Layne between about 1993 and 1995;

4.1.2   is the mother of Mr Kassim;

4.1.3   at all relevant times held the following accounts:

(1)    an account of number 65773 500 004 at Banque Indosuez Mer Rouge, Djibouti ("BIMR Djibouti");

(2)    an account of number 65773 101 0037 at BIMR Djibouti;

(3) an account numbered 1051923T at Banque Indosuez in Geneva.

(4) an account numbered 1051923F at Banque Indosuez in Geneva.

4.2 Chadia Kassim at all relevant times held the account referred to in 4.1.3(3) above ("the Blen Getachew Account") on behalf of a minor by the name of Blen Getachew, who is the son of Tamrat Layne.

5. The Fourth Defendant ("Negusse Hailu"):

5.1 had been at some time prior to April 1995 the agent in Ethiopia of a company which was known as "Ethiopian Trading Company" (and which is believed to have been the company referred to in 7 below or the company referred to in 8 below or a local affiliate of such company) with a salary of 5,000 Birr (or approximately US$600).

5.2 was at all relevant times a friend and associate of Mr Kassim.

5.3 was at all material times the fiancé of Tigist Hailu. 5.4 held the following accounts:

5.4.1 from 19 September 1995 a US dollar deposit account number 85953888 (from 19 September 1995 until about 21 June 1996 at Barclays Kensington and Chelsea branch, sort code 20-47-34, and from about 28 June 1996 onwards at Barclays Knightsbridge International Banking Centre, sort code 20-47-35 and subsequently 20-47-42) ("Negusse Hailu's US dollar account");

5.4.2 from a date presently unknown but no later than 29 December 1995 until about 25 October 1996 an instant savings account number 10833177 at Barclays Kensington and Chelsea branch, sort code 20-47-34;

5.4.3 from about 25 October 1996 an instant savings account number 00238023 at Barclays Knightsbridge International Banking Centre,

(together with the account referred to in 5.3.2 above "Negusse Hailu's instant savings account");

5.4.4 from a date presently unknown but no later than about 19 January 1996 until 25 October 1996 an account number 30789011 at Barclays Kensington and Chelsea branch, sort code 20-47-34, which he held jointly with Tigist Hailu (his then fiancée); and

5.4.5 from about 25 October 1996 an account number 00877085 at Barclays Knightsbridge International Banking Centre which he held jointly with Tigist Hailu until 4 July 2001 and thereafter in his sole name (together with the account referred to in 5.3.4 above "the Hailu joint account")

6. 6.1 Barclays (the Fifth Defendant) was joined as a defendant to the present action primarily for the purpose of obtaining "Norwich Pharmacal" style relief against it, in the form of disclosure orders of the type made by Mr Justice Owen on 18 January 2001 and Mr Justice Tomlinson on 18 September 2002.

6.2 For the time being, no further relief is sought from Barclays in these proceedings.

6A. The Sixth Defendant ("Tigist Hailu"):

6A.1 lives at Apartment 14L, 1320 York Avenue, NY 10021, USA;

6A.2 was during all or some of the events referred to below the fiancée of Negusse Hailu;

6A.3 held the following accounts:

6A.3.1 at all material times an account number 8610833751 at PNC Bank, Philadelphia, USA;

6A.3.2 from a date presently unknown but no later than 19 January 1996 until about 25 October 1996 an account number 30789011 at Barclays

Kensington and Chelsea branch, sort code 20-47-34, which she held
jointly with her fiancé, Negusse Hailu; and

6A.3.3 from about 25 October 1996 until about 4 July 2001 an account number
00877085 at Barclays Knightsbridge International Banking Centre
which she held jointly with her fiancé, Negusse Hailu (together with the
account referred to in 6A.3.2 above "the Hailu joint account").

6B.     The Seventh Defendant ("the HAK"):

6B.1    is or was at all material times an entity which Sheikh Al Amoudi believes to be
or have been either a company or trust incorporated or domiciled in
Switzerland;

6B.2    was at all material times owned and/or controlled by Mr Kassim and/or
Negusse Hailu;

6B.3    at all material times held an account at Barclaytrust Suisse, 10-12 Rue d'Italie,
Geneva 12, Switzerland.

6C.     The Eighth Defendant ("Ramiss"):

6C.1    is a private limited company incorporated in Ethiopia, whose shareholders are
Mr Kassim (50%) and his brother Wissam Kassim (50%);

6C.2    was granted a Business Licence issued in the name of Mr Kassim in 1995;

6C.3    states in its Articles of Association (Article 5.1) that it is to be managed by Mr
Kassim and that he is to have complete authority for that purpose. Sheikh Al
Amoudi believes that Wissam Kassim replaced his brother as General Manager
of Ramiss in about 1995;

6C.4    has a registered address (as recorded on its Business Licence and in its
Memorandum of Association) at Woreda 18, Kebele 27, House Number 301;

6C.5    at all material times held an account number 7991950183 at BIMR Djibouti
("the Ramiss Account").

6C.6   was at all material times controlled by Chadia Kassim or members of her family including Mr Kassim.

6D.   The Ninth Defendant ("Hanzalamu"):

6D.1   is to the best of Sheikh Al Amoudi's belief a company limited by shares and incorporated in Ethiopia;

6D.2   to the best of Sheikh Al Amoudi's belief included at all material times among its 4 identifiable shareholders Mr Kassim and Negusse Hailu and may at all material times have been controlled by them;

6D.3   at all material times had an account number 41-14-41-116 at the Delft branch of ABN Amro Bank ("the Hanzalamu Account").

6E.   The Tenth Defendant ("Mourad Ibrahim")

6E.1   is a business associate of Negusse Hailu.

6E.2   held at all material times a bank account at BIMR Djibouti.

[6F   The Eleventh Defendant ("Credit Agricole Indosuez")

6F.1   is and was at all material times a bank whose registered office and principal place of business in the UK is at 122 Leadenhall Street, London EC3V 4QH.

6F.2   acquired Banque Indosuez in 1996 to create a wholesale international banking arm.

6F.3   maintained a bank account in the name of Hussein Kassim at its office in London.

6F.4   was part of the Credit Agricole Suez group which provided private banking services to Hussein Kassim and Chadia Kassim from its offices in Geneva, Switzerland.

6F.5   was part of the Credit Agricole Suez group which maintained various accounts and provided other services to Chadia Kassim, Ramiss and Mourad Ibrahim at the offices of its affiliate, BIMR Djibouti.

6G.   Holbeach Limited ("Holbeach"):

6G.1   was at the material time a company incorporated in the British Virgin Islands which changed its name to Birchtree Limited in October 1996 and which has now been dissolved;

6F.2   from about 8 November 1995 until about 14 May 2001 held an account number 58253455 with Barclays ("the Holbeach Account").

6G.   Mirfleed Limited ("Mirfleed"):

6G.1   was at the material time a company incorporated in the British Virgin Islands which changed its name to Winword Limited in October 1996 and which has now been dissolved;

6G.2   from about 8 November 1995 until about 12 November 1999 held an account number 73162566 with Barclays ("the Mirfleed Account").

7.   An entity by the name of The Ethiopian Trading Co. Limited (which traded as "Ethiopian Trading Company"):

7.1   was an English company which was incorporated on 1 April 1982;

7.2   was dissolved on 25 May 1993.

8.   Another entity by the name of Ethiopian Trading Company Limited (which also traded as "Ethiopian Trading Company"):

8.1   was incorporated in Ireland on 17 April 1989;

8.2   was dissolved on 16 June 2000.

The Payment of US$16 million by Sheikh Al Amoudi

9.    9.1    At a meeting which took place on 5 April 1995 in Addis Ababa ("the Meeting on 5.4.95") between Sheikh Al Amoudi and Tamrat Layne (who was then the Prime Minister of Ethiopia):

9.1.1    Tamrat Layne informed Sheikh Al Amoudi:

(1)    that an unspecified foreign company had a claim for US$32 million against the Ethiopian Government ("the Government");

(2)    that the Government was now obliged to satisfy the claim, in two instalments of US$16 million.

9.1.2    Tamrat Layne requested that Sheikh Al Amoudi should fund the first instalment of US$16 million (referred to in 9.1.1(2) above), on the basis that the Government would provide to him a quantity of coffee beans of such value;

9.1.3    Sheikh Al Amoudi agreed to Tamrat Layne's request and thereby agreed to fund the instalment of US$16 million referred to in 9.1.1(2) above.

9.1.4    (1)    Tamrat Layne directed Sheikh Al Amoudi to make the payment of US$16 million by telegraphic transfer to the Account at Barclays Ascot;

(2)    Tamrat Layne provided Sheikh Al Amoudi with the number of, and the sort code relating to, the Account at Barclays Ascot, but did not specifically inform Sheikh Al Amoudi of the identity of the account holder.

9.2    9.2.1    On or about 5 April 1995 (following the Meeting on 5.4.95) Sheikh Al Amoudi gave instructions to ABN Amro Geneva to make a payment of US$16 million from Sheikh Al Amoudi's ABN Amro Account to the Account at Barclays Ascot.

> 9.2.2    On 7 April 1995 ABN Amro made a SWIFT transfer for value 10 April 1995 in the sum of US$16 million (referred to in 9.2.1 above) from Sheikh Al Amoudi's ABN Amro Account to the Account at Barclays Ascot and its sterling equivalent of £10,003,119.98 was credited to that account.

### The Representations made by Tamrat Layne

10.    10.1    In the circumstances referred to in 9 above, Tamrat Layne made the following representations to Sheikh Al Amoudi before Sheikh Al Amoudi made the payment referred to in 9.2 above:

> 10.1.1    Tamrat Layne impliedly represented to Sheikh Al Amoudi that the Account at Barclays Ascot was held by the foreign company referred to in 9.1.1(1) above;

> 10.1.2    Tamrat Layne expressly and/or impliedly represented to Sheikh Al Amoudi that if he were to make a payment of the sort requested by Sheikh Al Amoudi (in the circumstances referred to in 9.1.2 above) the same would be utilised in partial satisfaction of the claim referred to in 9.1.1(1) above and, in particular, in discharge of the first of the instalments referred to in 9.1.1(2) above;

10.2    In the circumstances, at the time he made the payment referred to in 9.2 above Sheikh Al Amoudi believed:

> 10.2.1    that the Account at Barclays Ascot was held by the foreign company referred to in 9.1.1(1) above and/or by a foreign company which had a claim against the Government ;

> 10.2.2    that it was the intention of Tamrat Layne that the monies which were to be provided by means of that payment should be utilised in partial satisfaction of the claim referred to in 9.1.1(1) above and, in particular, in discharge of the first of the instalments referred to in 9.1.1(2) above.

11.  11.1  Further, following the making of the payment referred to in 9.2 above, Tamrat Layne represented to Sheikh Al Amoudi:

11.1.1  that the payment of US$16 million had been made into an account held by the foreign company referred to in 9.1.1(1) above;

11.1.2  that the payment of US$16 million had been utilised in partial satisfaction of the claim referred to in 9.1.1(1) above and, in particular, in discharge of the first of the instalments referred to in 9.1.1(2) above;

11.2  In particular:

11.2.1  following an enquiry (made by Sheikh Al Amoudi on or at some time after 10 April 1995) as to the exact name of the "beneficiary" of the payment referred to in 9.2 above, Tamrat Layne informed Sheikh Al Amoudi, by means of a handwritten fax dated 19 April 1995 that the recipient of the payment was "Ethiopian Trading Company";

11.2.1A  the same day, Sheikh Al Almoudi informed ABN Amro that the name of the beneficiary was "Ethiopian Trading Company" and ABN Amro sent a SWIFT message to Barclays stating that "THE BENEFICIARY'S NAME IS ETHIOPIAN TRADING COMPANY..."

11.2.2  in the circumstances, Sheikh Al Amoudi understood and believed at all relevant times that "Ethiopian Trading Company" was the foreign company which had been referred to by Tamrat Layne at the Meeting on 5.4.95 (in the circumstances referred to in 9.1.1 above);

11.3.  In the circumstances, at all relevant times until the events referred to in 18 below Sheikh Al Amoudi believed that the Account at Barclays Ascot was held by the foreign company referred to in 9.1.1(1) above.

### The Claim in Deceit against Tamrat Layne

12.  In fact:

12.1    the Account at Barclays Ascot was the account of Mr Kassim and was not an account held by "Ethiopian Trading Company", and/or by the foreign company which had been referred to by Tamrat Layne at the Meeting on 5.4.95;

12.2    it was never the intention of Tamrat Layne that the sum of US$16 million which was to be provided by Sheikh Al Amoudi (and which was in due course provided by Sheikh Al Amoudi) would be utilised in partial satisfaction of the claim referred to in 9.1.1(1) above or in satisfying in whole or in part any claim owed by the Government to the foreign company referred to in 9.1.1(1) above;

12.3    the payment of US$16 million referred to in 9.2 above was not utilised in satisfying any part of the claim referred to in 9.1.1(1) above or in satisfying in whole or in part any claim against the Government by the foreign company referred to in 9.1.1(1) above but was misappropriated (as Tamrat Layne, Mr Kassim and Chadia Kassim had always intended that it should be) by Mr Kassim, Chadia Kassim and Negusse Hailu (in the circumstances referred to in 15, 16 and 17 below ).

13.    Sheikh Al Amoudi will contend:

13.1    13.1.1    that at the time he made the representations referred to in 10.1 and 11.1 and 11.2 above, Tamrat Layne:

(1)    knew that those statements and representations were untrue;

(2)    intended that Sheikh Al Amoudi should rely upon those statements in the manner referred to in 13.2 below;

13.1.2    in particular, that Tamrat Layne:

(1)    was at all relevant times aware:

(a)    that the Account at Barclays Ascot was the account of Mr Kassim and was not an account held by a foreign company with a claim against the Government ;

(b) that the sum of US$16 million which was to be provided by (and was in due course provided by) Sheikh Al Amoudi would not be utilised in partial satisfaction of any claim against the Government by the foreign company referred to in 9.1.1(1) above;

(2) at all material times intended that the sum of US$16 million which was to be provided by (and was in due course provided by) Sheikh Al Amoudi should be misappropriated by Mr Kassim, Chadia Kassim and Negusse Hailu (as in due course occurred in the circumstances referred to in 15, 16 and 17 below).

13.2    13.2.1    that Sheikh Al Amoudi relied upon the representation referred to in 10.1 above:

(1) by giving instructions to ABN Amro (in the circumstances referred to in 9.2.1 above) to make the payment of US$16 million to the Account at Barclays Ascot; and hence

(2) by making that payment;

13.2.2    further or in the alternative, that Sheikh Al Amoudi relied upon the representation referred to in 11.1 and 11.2 above by refraining from taking steps to recover the payment of US$16 million which he had made into the Account at Barclays Ascot;

13.3    that, in the circumstances, by making the fraudulent representations referred to in 10.1, 11.1 and 11.2 above, Tamrat Layne committed the tort of deceit.


## The Claim against Mr Kassim for Money Had and Received on the basis of mistake

14.    Further, in the circumstances, Sheikh Al Amoudi will contend that:

14.1    Sheikh Al Amoudi made the payment referred to in 9.2 above under a mistake of fact, in that:

14.1.1 he believed at the time that payment was made that the account into which it was being paid (namely the Account at Barclays Ascot) was that of the foreign company referred to in 9.1.1(1) above; whereas

14.1.2 the account to which it was being paid, and was paid, (namely the Account at Barclays Ascot) was not that of a foreign company with a claim against the Government, but was that of Mr Kassim;

14.2 further or in the alternative, Mr Kassim provided no consideration or value for the payment referred to in 9.2 above;

14.3 Sheikh Al Amoudi is entitled to the return of the payment of US$16 million referred to in 9.2 above from Mr Kassim as money had and received by Mr Kassim to the use of Sheikh Al Amoudi.

### The Manner in which the sum of US$16 million was dealt with and misappropriated

15. Following the receipt into the Barclays Ascot Account (on 10 April 1995) of the sum of US$16 million referred to in 9.2 above Mr Kassim caused the following payments (the combined value of which was the approximate sterling equivalent of US$16 million) to be made from those monies:

15.1 15.1.1 On 12 April 1995 the sum of £7 million (the equivalent of US$11,141,902) was paid by telegraphic transfer from the Barclays Ascot Account to Chadia Kassim's account (of number 65773 500 004) at BIMR Djibouti. On 13 April 1995 that account was credited with a further sum of US$199,955;

15.1.2 On 18 April 1995 a sum of £2,000,000 was debited from Mr Kassim's Kensington Account (from the monies previously credited to the Account at Barclays Ascot) pursuant to a cheque number 100004 payable to Hiwot Habte, Mr Kassim's wife. On 19 April 1995 the proceeds of the cheque were credited to Hiwot Habte's Student account number 60430722 at Barclays' Westminster branch. Shortly thereafter Hiwot Habte gave instructions to Barclays to transfer the £2,000,000 "to the account of Mr H.A. Kassim at Barclays Bank Kensington – sort code 20 45 48" adding that the account to be credited was "Sundry Persons at Kensington 38020027" ("the Sundry

Persons Account"). The Sundry Persons Account was credited with that sum on the same day. On 19 April 1995 Mr Kassim gave Barclays instructions that, upon receipt of the £2,000,000, that sum should be added to his call deposit with Barclays Finance Company Jersey;

15.2  15.2.1  On 21 April 1995 Mr Kassim transferred a further sum of £950,000 from his Barclays Ascot Account to the Sundry Persons Account. On the same day the sum of £2,950,000 (comprising the £2,000,000 referred to in 15.1.2 above together with the further £950,000 from the monies previously credited to the Account at Barclays Ascot) was transferred by telegraphic transfer to Mr Kassim's Jersey Account;

15.2.2  On 5 May 1995 Mr Kassim instructed Barclays to transfer the sum of £3 million (including the monies referred to in 15.2.1 above and a further sum of £45,000 previously transferred from Mr Kassim's Kensington Account to his Jersey Account on 3 May 1995) from Mr Kassim's Jersey Account to the account of Chadia Kassim (of number 65773 500 004) at BIMR Djibouti. The monies were subsequently transferred pursuant to this instruction on 19 May 1995.

16.  16.1  On 23 April 1995, following the receipt into her account number 65773 500 004 at BIMR Djibouti (on 12 April 1995) of the sum of £7 million (referred to in 15.1.1 above) Chadia Kassim caused that sum together with a further US$199,955 (a total of US$11,341,835) to be transferred from that account to her account of number 65773 101 0037 at BIMR Djibouti.

16.2  From the monies which were paid into her account of number 65773 101 0037 at BIMR Djibouti in the circumstances referred to in 16.1 above, Chadia Kassim caused the following payments to be made:

16.2.1  On 22 May 1995 Chadia Kassim caused the sum of US$500,000 to be transferred into the Blen Getachew Account.

16.2.2 On 22 May 1995 Chadia Kassim caused two sums of US$4,000,000 and US$2,200,000 respectively to be paid to her account 1051925F at Banque Indosuez in Geneva.

16.2.3 On 22 May 1995 Chadia Kassim caused a further transfer of US$1,100,000 to be made to the Ramiss Account and two payments of US$100,000 and US$100,000 to persons/entities as yet unidentified.

16.3 On 19 May 1995, Mr Kassim gave the instruction to make the transfer of £3 million to Chadia Kassim from his Jersey Account. On 23 May 1995, the value of such transfer in US dollars (US$4,659,899.51) was credited to Chadia Kassim's account 65773 101 0037 at BIMR Djibouti, as was a further US$500,000 representing the proceeds of a bribe from Sogea. This brought the balance on such account to US$8,501,440.51 (including the remaining monies previously transferred by Mr Kassim as set out in paragraph 16.1 above). From such account the following payments were made:

16.3.1 On 23 May 1995 Chadia Kassim gave instructions for the sum of US$6,443,447.95 to be paid by telegraphic transfer to Mr Kassim at Barclays in Kensington. That sum (net of charges) was received into Mr Kassim's US dollar account number 82059600 at Barclays in Kensington on 31 May 1995 and was then placed on a fixed term deposit in Mr Kassim's name maturing on 14 July 1995;

16.3.2 In late May 1995 Chadia Kassim caused a payment of US$340,090.83 to be made to Mr Kassim's US dollar account number 82059600 at Barclays in Kensington. This sum was probably paid out of the sum of US$417,000 transferred from Chadia Kassim's account number 65773 101 0037 as described in 16.3.4 below. The sum of US$340,090.83 was credited to Mr Kassim's dollar account on 30 May 1995 and was then placed on a fixed term deposit in Mr Kassim's name maturing on 14 July 1995.

16.3.3 On 24 May 1995 with value 23 May 1995 Chadia Kassim caused payments to be made to entities to which Negusse Hailu was indebted, in discharge or in reduction of the indebtedness of Negusse Hailu to those entities.

## PARTICULARS

| Payee | Amount |
|---|---|
| Continental Trading Co | US$250,000.00 |
| Kitco | US$  2,239.25 |
| Hanzalamu | US$ 74,084.80 |
| Luc Marill | US$230,000.00. |

16.3.4 On 24 May 1995 Chadia Kassim caused further payments to be made out of her account number 65773 101 0037 as follows:

A sum of US$417,000 to her account number 65773 500 004 at BIMR Djibouti;

A sum of US$1,000,000 to the Ramiss Account;

A sum of US$50,000 to Ramiss apparently in favour of Wissam Kassim;

A sum of US$50,000 to Wissam Kassim;

A sum of US$74,084.80 to the Hanzalamu Account.

16.4   Of the monies paid into Mr Kassim's US dollar account number 82059600 at Barclays in Kensington as set out above monies totalling nearly US$6 million were subsequently dissipated by Mr Kassim as set out below:

16.4.1 On 23 August 1995 a sum of US$10,000.00 was transferred to a "Wolde Yohanes", (the beneficiary of which payment Sheikh Al Amoudi currently cannot identify);

16.4.2 On 23 August 1995 a sum of US$250,000 was transferred to the account of Tigist Hailu (Negusse Hailu's fiancée) at PNC Bank, account number 8610833751;

16.4.3 On 25 August 1995 a sum of US$400,048.05 was transferred to an account with the reference "SI MOHAMED", (the beneficiary of which payment Sheikh Al Amoudi currently cannot identify);

16.4.4 On 18 October 1995 a payment to Tilhurst Limited, a company incorporated in England under company number 02464228, in the sum of US$93,000. This payment was made for a sale by Tilhurst to Hanzalamu of a second hand Caterpillar Motor Grader;

16.4.5 On 18 October 1995 a sum of US$100,000 was transferred to a sub-account of "Attendus Holdings GS Inc";

16.4.6 On 18 October 1995 a sum of US$157,000 was transferred to the account of Tigist Hailu at PNC Bank, account number 8610833751;

16.4.7 On 18 October 1995 a sum of US$200,000 was transferred to a company called AT & T Global Information Services which held an account at Popular Bank in Cyprus with the reference "AT and T GIS";

16.4.8 On 18 October 1995 a sum of US$200,000 was transferred to Negusse Hailu's US dollar account;

16.4.9 On 18 October 1995 a sum of US$400,000 was transferred to a joint account in the names of Mr Kassim and Negusse Hailu at Banca del Gottardo, Lugano, Switzerland;

16.4.10 On 7 November 1995 a sum of US$2,800,000 was transferred to an account held by the HAK at Barclaytrust in Switzerland;

16.4.11 On 14 November 1995 a sum of US$300,000 was transferred to the Mirfleed Account;

16.4.12 On 14 November 1995 a sum of US$900,000 was transferred to the Holbeach Account;

16.4.13 On 19 December 1995 a sum of US$171,615.04 was transferred to Negusse Hailu's US dollar account;.

16.4.14 There were also a series of other transfers to Mr Kassim's Kensington Account. In particular, on 21 August 1996, Mr Kassim transferred a

sum of US$108,780 from his US dollar account to his Kensington Account (the sterling amount credited being £70,000).

16.5     A series of smaller payments were made from Mr Kassim's Kensington Account from May 1995 onwards into Hiwot Habte's account. Some of these were funded by payments from Mr Kassim's dollar account number 82059600 (to which some of the proceeds of the fraud had been credited as explained above). From September 1995 payments were also made directly from Mr Kassim's dollar account number 82059600 into Hiwot Habte's account. Other payments were also made by Mr Kassim into Hiwot Habte's account.

16.6     On 22 August 1996 Mr Kassim transferred a sum of £70,000 out of his Kensington Account to one Bruno Longy, a school friend of Negusse Hailu.

16.7     Following the two transfers to Negusse Hailu referred to in paragraphs 16.4.8 and 16.4.13 above.    Negusse Hailu made the following transfers from his US dollar account:

16.7.1 On 23 October 1995 a sum of US$32,000 to Baron Materials;

16.7.2 On 29 December 1995 a sum of US$20,000 to his instant savings account (the sterling amount credited being £12,832.85);

16.7.3 On 29 December 1995 a sum of US$46,545 to his instant savings account (the sterling amount credited being £30,000);

16.7.4 On 19 January 1996 a sum of US$45,540 to the Hailu joint account (the sterling amount credited being £30,000);

16.7.5 On 29 August 2001 a sum of US$10,000 to Mourad Ibrahim;

16.7.6 On 29 August 2001 a sum of US$20,000 to Mr Dickson Banda:

16.7.7 On 19 February 2002 a sum of US$20,000 to Mourad Ibrahim;

16.8     On 29 July 1996 following the payment referred to in 16.7.3 above Negusse Hailu transferred £10,000 from his instant savings account to the Hailu joint account.

16.9    On 30 July 1996 he transferred a sum of £70,000 from the Hailu joint account to Bruno Longy (out of the sums referred to in 16.7.4 and 16.8 above, together with a further £50,000 received into the Hailu joint account from an unknown party on 29 July 1996);

16.10   Following the payments referred to in 16.7, 16.8 and 16.9 above, Negusse Hailu made the following transfers:

    16.10.1   On 12 October 1999 a sum of £80,000 from his instant savings account to the Hailu joint account on the joint instructions of Negusse Hailu and Tigist Hailu;

    16.10.2   On 21 October 1999 a sum of £70,000 from the Hailu joint account to Mourad Ibrahim on the instructions of Tigist Hailu;

    16.10.3   On 6 November 1999 a sum of £3,000 from the Hailu joint account to "Miss T Hailu";

    16.10.4   On 9 February 2001 a sum of £14,838.58 (the sterling equivalent of US$21,000) from the Hailu joint account to Citibank in the US;

    16.10.5   On 13 Feburary 2001 a sum of £10,000 from the instant savings account to the Hailu joint account; and

    16.10.6   On 26 February 2001 a sum of £10,705.03 (the sterling equivalent of US$15,000) from the Hailu joint account to Citibank in the US.

16.11   Following the transfer of £140,000 to Bruno Longy (comprising the £70,000 payment from Mr Kassim described in paragraph 16.6 above and the £70,000 payment from Negusse Hailu described in paragraph 16.9 above) Bruno Longy used these monies to purchase a Costcutter supermarket franchise at 16-20 Crossthwaite Avenue, London  SE5 8ET ("the Costcutter store").  This purchase was made pursuant to an oral agreement between Mr Kassim, Negusse Hailu and Bruno Longy.  In or about [June 2001] Bruno Longy sold the Costcutter store for approximately £200,000.  Negusse Hailu instructed Bruno Longy to pay his and Mr Kassim's share of the proceeds from the sale of the Costcutter store to a specified account abroad.  Pursuant to these instructions, Bruno Longy transferred a total of at least £109,108 out of his NatWest account to Mr Mourad Ibrahim as follows:

| 25 June 2001 | £53,036 |
| 26 June 2001 | £20,036 |
| 20 July 2001 | £35,036. |

Bruno Longy retained the balance of the sale proceeds for his own use.

The tracing claims

17.    17.1    As far as Sheikh Al Amoudi is aware there was no legitimate or honest reason for any of the payments referred to in 15 or 16 above to be made:

      17.1.1    to Mr Kassim;

      17.1.2    to Chadia Kassim;

      17.1.3    to Blen Getachew;

      17.1.4    to Negusse Hailu

      17.1.5    to Hiwot Habte;

      17.1.6    to Tigist Hailu;

      17.1.7    to the HAK;

      17.1.8    to Ramiss;

      17.1.9    to Hanzalamu;

      17.1.10   to Holbeach;

      17.1.11   to Mirfleed;

      17.1.12   to Mourad Ibrahim.

    17.2    None of the individuals or entities referred to in 17.1 provided any value for those payments.

    17.3    In the circumstances:

17.3.1    the sum of US$16 million (which was paid by Sheikh Al Amoudi in the circumstances referred to in 9.2 above) was misappropriated as described above;

17.3.2    Sheikh Al Amoudi is entitled to trace the following sums in law and/or in equity and is entitled to the return of those sums and/or all assets or property acquired with those sums and/or which now represent those sums:

(1)    from Chadia Kassim, the sum of £10 million (being the total of the payments referred to in 15.1.1 and 15.2.2 above);

(2)    From Mr Kassim, the sums of US$6,443,447.95 and/or US$340,090.83 (being the sums referred to in 16.3.1 and 16.3.2 above) together with all sums received by the HAK, Ramiss and Hanzalamu and together with the sum of US$400,000 referred to in 16.4.9 above;

(3)    From Negusse Hailu, the sums of US$556,324.05, US$200,000, US$400,000 and US$171,615.04 (being the total of the payments referred to in 16.3.3 above and the further sums referred to in paragraphs 16.4.8, 16.4.9 and 16.4.13 above) together with all sums received by the HAK;

(4)    From Tigist Hailu the sums of US$250,000, US$157,000, US$45,540, £10,000, £80,000, £3,000 and £10,000 (being the sums referred to in 16.4.2, 16.4.6, 16.7.4, 16.8, 16.10.1, 16.10.3 and 16.10.5 above);

(5)    From the HAK the sum of US$2,800,000 (being the sum referred to in 16.4.10 above);

(6)    From Hanzalamu the sum of US$74,084.80 (as referred to in 16.3.4 above) together with the proceeds of or property representing the further sum of US$93,000 (as referred to in 16.4.4 above);

(7)     From Ramiss the sums of US$1,100,000, US$50,000 and US$1,000,000 (as referred to in 16.2.3 and 16.3.4 above);

(8)     From Mourad Ibrahim the sums of US$10,000, US$20,000 and £70,000 (as referred to in 16.7.5, 16.7.7 and 16.10.2 above), and the further sum of £108,108 from the Costcutter sale as referred to in 16.11 above.

Sheikh Al Amoudi's discovery that the Account at Barclays Ascot was not held by the Government/The Ethiopian Trading Company

18.     18.1    By means of an inter-bank message dated 12 December 1996, Barclays Ascot informed ABN Amro Geneva that the Account at Barclays Ascot was the account of Mr Kassim.

18.2    In about December 1996, following the events referred to in 18.1 above, Sheikh Al Amoudi became aware:

18.2.1    that the Barclays Ascot Account was not, in fact, an account held by the Ethiopian Trading Company, or by a foreign company which had been concerned with the transaction referred to in 9.1.1 above;

18.2.2    that the Barclays Ascot Account was, in fact, the account of Mr Kassim.

Accessory Liability: The Claim in Constructive Trusteeship against Mr Kassim, Tamrat Layne, Chadia Kassim, Negusse Hailu, Tigist Hailu, the HAK and Ramiss

19.     Further or in the alternative, Sheikh Al Amoudi will contend:

19.1    19.1.1    that in the circumstances referred to in 1.2, 3.1 and 9 above Tamrat Layne owed him a fiduciary duty:

(1)     to utilise the sum of US$16 million provided by Sheikh Al Amoudi (in the circumstances referred to in 9.2 above) for the purpose for which Tamrat Layne had indicated that it would

be utilised (namely the discharge of the instalment referred to in 9.1.2 above);

(2) to ensure that neither the sum of US$16 million (referred to in 9.2 above) nor any part of it was used for the wrongful gain of himself or anyone associated with him;

19.1.2 further or in the alternative, that:

(1) Sheikh Al Amoudi, having paid the sum of US$16 million (referred to in 9.2. above) to Mr Kassim under a mistake of fact (in the circumstances referred to in 14 above) retained an equitable property in those monies;

(2) the conscience of Mr Kassim was subject to a fiduciary duty to respect the proprietary right of Sheikh Al Amoudi in the monies referred to in 9.2 above;

19.2 further:

19.2.1 that in directing Sheikh Al Amoudi to pay the sum of US$16 million (referred to in 9.2 above) into the Account at Barclays Ascot (in the circumstances referred to in 12 above) and:

(1) in thereby causing that payment to be made into that account; and

(2) in causing the proceeds of that payment to be utilised in the manner referred to in 15, 16 and 17 above;

Tamrat Layne acted in breach of the fiduciary duty referred to in 19.1.1 above;

19.2.2 that:

(1) in failing to return to Sheikh Al Amoudi:

(a) the sum of US$16 million referred to in 9.2 above; and

(b) the sums referred to in 17.3.2(2) above;

and

(2)     by causing and/or permitting the sum of US$16 million to be
        dealt with in the manner referred to in 15, 16 and 17 above;

Mr Kassim acted in breach of the fiduciary duty referred to in 19.1.2
above.

20.     Further or in the alternative, Sheikh Al Amoudi will contend as against Mr Kassim:

20.1    20.1.1    that in allowing the Account at Barclays Ascot and the other accounts
                  referred to in 15-17 above to be used for the receipt of the monies
                  which Tamrat Layne had defrauded Sheikh Al Amoudi into paying;
                  and

        20.1.2    that in causing or permitting the payments referred to in
                  15.1.1,15.1.2, 15.2.1, 15.2.2, 16.2, 16.3 and 16.4 above to be made to
                  or from accounts which were held by or controlled by him;

Mr Kassim dishonestly assisted the breach by Tamrat Layne of the duty
referred to in 19.1.1 above;

20.2    in particular, that Mr Kassim's dishonesty is apparent in, and is to be inferred
        from:

        20.2.1    the fact that the Account at Barclays Ascot and other accounts
                  referred to in 15.1.1, 15.1.2, 15.2.1, 15.2.2, 16.2, 16.3 and 16.4 above
                  were being used as receptacles for the misappropriated monies and
                  the onward transmission of such monies;

        20.2.2    the fact that Mr Kassim provided no value or benefit to the
                  Government or to Sheikh Al Amoudi, for which the monies received
                  by him or on his behalf might have constituted payment;

        20.2.3    from the fact that (as Mr Kassim was at all relevant times aware)
                  there was no legitimate reason why those monies should have been
                  paid to him;

20.2.3A   the fact that the steps taken by Mr Kassim to transfer the funds had the natural consequence of obscuring the origin of such funds and making them more difficult to trace and that he personally benefited from the receipt of some of the funds;

20.2.3B   the findings of dishonesty made against him in the Ethiopian Criminal proceedings.

20.2.4   (1)   from the fact that he was the son of Chadia Kassim; and

(2)   from the relationship between Chadia Kassim and Tamrat Layne (as described in 4.1.1 above);

(3)   from the payments made to his wife Hiwot Habte referred to in paragraphs 15.1.2 and 16.5 above;

20.3   that in the circumstances Mr Kassim is liable to Sheikh Al Amoudi in constructive trusteeship as an accessory for knowingly assisting Tamrat Layne to commit the breach of duty referred to in 19.1.1 above.

21.   Further or in the further alternative, Sheikh Al Amoudi will contend as against Tamrat Layne:

21.1   21.1.1   that in acting in the manner referred to in 9, 10, 11, 12 and 13 above, Tamrat Layne dishonestly assisted the breach by Mr Kassim of the duty referred to in 19.1.2 above;

21.1.2   further or in the alternative, that it is to be inferred:

(1)   from Tamrat Layne's apparent role as the instigator of the misappropriation of monies from Sheikh Al Amoudi; and

(2)   from the relationship between Tamrat Layne and Chadia Kassim (referred to in 4.1.1 above) and from the fact that Tamrat Layne is the father of  Blen Getachew (on whose behalf Chadia Kassim held the account referred to in 4.2 and 16.2.1 above);

that Tamrat Layne provided additional and more general assistance to Mr Kassim in connection with Mr Kassim's breach of the duty referred to in 19.1.2 above;

21.2   in particular, that Tamrat Layne's dishonesty is apparent in and is to be inferred from:

21.2.1   the acts of deception referred to in 13.1 above;

21.2.2   the fact that Tamrat Layne was at all relevant times aware that neither Mr Kassim nor any of the individuals who held the accounts referred to in 15 and 16 above had provided value or benefit to the Government or to Sheikh Al Amoudi, for which the monies referred to in 15 and 16 might have constituted payment;

21.2.3 the fact that (as Tamrat Layne was at all relevant times aware) there was no legitimate reason why those monies should have been paid to those individuals;

21.2.4 the findings of dishonesty made against him in the Ethiopian Criminal Proceedings and his conviction in those proceedings.

21.3   that in the circumstances Tamrat Layne is liable to Sheikh Al Amoudi in constructive trusteeship as an accessory for knowingly assisting Mr Kassim to commit the breach of duty referred to in 19.1.2 above.

22.   Further or in the alternative, Sheikh Al Amoudi will contend as against Chadia Kassim:

22.1   22.1.1   that in allowing the accounts referred to in 15 and 16 above to be used as receptacles for the payment of and misappropriation of monies which Tamrat Layne had defrauded Sheikh Al Amoudi into paying; and

22.1.2   in causing or permitting payments referred to in 16 above to be made from accounts which were held by her;

Chadia Kassim dishonestly assisted:

    (1)     the breach by Tamrat Layne of the duty referred to in 19.1.1 above;

    (2)     the breach by Mr Kassim of the duty referred to in 19.1.2 above;

22.2    in particular, that Chadia Kassim's dishonesty is apparent in and is to be inferred from:

22.2.1    the fact that the accounts referred to in 15 and 16 above were being used as mere receptacles for the appropriation of the monies which Tamrat Layne had defrauded Sheikh Al Amoudi into paying and the onward transmission of the misappropriated monies;

22.2.2    the fact that Chadia Kassim provided no value or benefit to Sheikh Al Amoudi or to the Government, for which the monies received by her or on her behalf might have constituted payment;

22.2.3    the fact that (as Chadia Kassim was at all relevant times aware) there was no legitimate reason why those monies should have been paid to her;

22.2.4    from the nature of her relationship:

    (1)     with Tamrat Layne; and

    (2)     with Mr Kassim.

22.2.5    the findings of dishonesty made against her in the Ethiopian Criminal Proceedings and her conviction in those proceedings.

22.3    that in the circumstances Chadia Kassim is liable to Sheikh Al Amoudi in constructive trusteeship as an accessory:

22.3.1    for knowingly assisting Tamrat Layne to commit the breach of duty referred to in 19.1.1 above;

22.3.2    for knowingly assisting Mr Kassim to commit the breach of duty referred to in 19.1.2 above.

23.    Further or in the alternative, Sheikh Al Amoudi will contend as against Negusse Hailu:

    23.1    that it is to be inferred from the fact that Negusse Hailu received monies as described in 16 above (in the circumstances referred to in 17 above) that he dishonestly assisted:

        23.1.1    the breach by Tamrat Layne of the duty referred to in 19.1.1 above;

        23.1.2    the breach by Mr Kassim of the duty referred to in 19.1.2 above;

    23.2    further, Negusse Hailu's dishonesty is to be inferred from the matters referred in 5.1 and 5.2 above and from the findings made in and his conviction in the Ethiopian Criminal Proceedings;

    23.3    that in the circumstances Negusse Hailu is liable to Sheikh Al Amoudi in constructive trusteeship as an accessory:

        23.3.1    for knowingly assisting Tamrat Layne to commit the breach of duty referred to in 19.1.1 above;

        23.3.2    for knowingly assisting Mr Kassim to commit the breach of duty referred to in 19.1.2 above;

23A.    In relation to Tigist Hailu:

    23A.1    In receiving, paying and giving instructions for the payment of monies as described in paragraph 16 above in the circumstances described in paragraph 17 above and in maintaining the private banking relationship with Barclays, Tigist Hailu assisted the breaches of fiduciary duty by Tamrat Layne and Mr Kassim. Further some of the monies misappropriated in breach of fiduciary duty were paid to Tigist Hailu and/or for her own benefit. It is to be inferred from the following matters that, in assisting such breaches of duty by Mr Layne and/or Mr Kassim, Tigist Hailu acted dishonestly. Further or in the alternative it would in the circumstances be unconscionable for her to retain the benefit of the monies she has received.

    23A.1.1    Tigist Hailu was at all material times the fiancée of Negusse Hailu with whom she held a joint bank account;

23A.1.2 She received a total sum of US$407,000 into her account in Philadelphia from Mr Kassim, a friend and business associate of her fiancé, apparently without explanation.

23A.1.3 She received (into the Hailu joint account in respect of which, as a joint account holder, she would have received bank statements):

    23A.1.3.1    £30,000 from Negusse Hailu's US dollar account on 19 January 1996, apparently without explanation;

    23A.1.3.2    £10,000 from Negusse Hailu's instant savings account on 29 July 1996, apparently without explanation;

    23A.1.3.3    £80,000 from Negusse Hailu's instant savings account on 12 October 1999, apparently without explanation, but at a time when Tigist Hailu was fully aware of the allegations against Negusse Hailu and the circumstances surrounding the misappropriation of Sheikh Al Amoudi's US$16million in view of the criminal proceedings taking place in Ethiopia referred to in paragraph 29 below;

    23A.1.3.4    £10,000 from Negusse Hailu's instant savings account on 13 February 2001, apparently without explanation.

23A.1.4 She received a sum of £3,000 from her fiancé, Negusse Hailu, into an unspecified account in her name on 6 November 1999, apparently without explanation.

23A.1.5 She gave instructions to Barclays:

    23A.1.5.1    on 12 October 1999 to make the transfer referred to in 23A.1.3.3 above; and

    23A.1.5.2    on 13 October 1999 to transfer out of the Hailu joint account a sum of £70,000 to Mourad Ibrahim, thereby helping her fiancé to launder these monies and/or helping to conceal their origin;

23A.1.6 She misled Barclays about the whereabouts of Negusse Hailu, telling them that he lived with her in the US when in fact he was imprisoned on charges of

corruption and embezzlement in Ethiopia, thereby continuing to help him to dissipate the monies misappropriated from Sheikh Al Amoudi, as follows:

23A.1.6.1    On or about 25 September 1998 Tigist Hailu told Barclays that she and Negusse Hailu, her fiancé, were living in the US. At this time, Negusse Hailu had been arrested by the Ethiopian authorities and was awaiting trial.

23A.1.6.2    In or around April 1999, Tigist Hailu completed an Inland Revenue form at Barclays' request and indicated that Negusse Hailu could not sign the form as he was *"away for a few months"*.

23A.1.6.3    Negusse Hailu has continued to use Tigist Hailu's address in New York as his mailing address whilst he has been in prison.

23A.1.6.4    Tigist Hailu has remained a principal point of contact for Barclays in respect of any queries raised over Negusse Hailu's accounts, and has not revealed Negusse Hailu's conviction or imprisonment to Barclays, thereby making it easier for him to continue to dissipate funds.

23A.1.7 It is to inferred from the fact that Negusse Hailu has been in prison in Ethiopia since October 1996 that Tigist Hailu was responsible for the payments made out of the account made after this date, including:

23A.1.7.1    a payment of £14,838.58 on 9 February 2001 to Citibank in the US; and

23A.1.7.2    a payment of £10,705.03 on 26 February 2001 to Citibank in the US.

23B.    In relation to the HAK:

23B.1 The HAK was at all material times under the effective control of Mr Kassim and/or Negusse Hailu and their dishonesty is to be imputed to the HAK;

23B.2 In his statement in the Ethiopian Criminal Proceedings Negusse Hailu said that following a meeting with Mr Kassim in London in October 1995 he transferred US$2,800,000 into "[their] joint account";

23B.3 No consideration was given for the transfer of US$2,800,000 nor was there any legitimate reason for such transfer;

23B.4 It is to be inferred from these matters and the matters in 15-17 above that the HAK dishonestly assisted in the breaches of fiduciary duty by Tamrat Layne and Mr Kassim.

23C. In relation to Ramiss:

23C.1 Ramiss was at all material times under the effective control of Chadia Kassim and/or members of her family including Mr Kassim and their dishonesty is to be imputed to the HAK;

23C.2 In the Reasons for Sentencing in the Ethiopian Criminal Proceedings the Court recorded that Chadia Kassim "deposited US$2.5m into the account of Ramisss";

23C.3 In his 3rd affidavit in this action Mr Kassim confirmed that he still held 50% of the shares in Ramiss, with his brother Wissam holding the other shares, mentioned that the only account in Djibouti he was connected with was held by "Ramsis International Limited" and said that his brother or his mother were the only signatories to the account. Subsequently in his 4th affidavit he corrected the reference to Ramiss (the misspelling) and claimed that Ramiss also had an account at Addis Ababa at the Commercial Bank;

23C.4 No consideration was given for the transfers to Ramiss nor was there any legitimate reason for such transfers;

23C.5 It is to be inferred from these matters and the matters in 15-17 above that Ramiss dishonestly assisted in the breaches of fiduciary duty by Tamrat Layne and Mr Kassim.

The Claim in Constructive Trusteeship against Mr Kassim, Chadia Kassim,

Negusse Hailu, Tigist Hailu, the HAK and Ramiss for "knowing receipt"

24. Further or in the alternative, Sheikh Al Amoudi will contend as against Mr Kassim:

    24.1    that the sum of US$16 million (referred to in 9.2.2 above) and/or the sums referred to in 17.3.2(2) above were paid to Mr Kassim and received by him in breach of the fiduciary duty referred to in 19.1.2 above;

    24.2    that it is to be inferred from the matters referred to in 20.1 and 20.2 above that Mr Kassim received those sums in the knowledge:

        24.2.1    that the same belonged to Sheikh Al Amoudi; and/or

        24.2.2    that the same had been paid to Mr Kassim in breach of fiduciary duty;

    24.3    further or in the alternative that in the circumstances it is unconscionable that Mr Kassim should be allowed to retain those sums;

    24.4    that in the circumstances Mr Kassim holds on constructive trust and/or is liable to account to Sheikh Al Amoudi for:

        24.4.1    the sum of US$16 million; and/or

        24.4.2    the sum of US$340,090.83; and/or

        24.4.3    the sum of US$6,443,447.95; and/or

        24.4.4    the sums received by the HAK, Ramiss and Hanzalamu; and/or

        24.4.5    all assets and property held by Mr Kassim which were acquired directly or indirectly with such sums, together with such assets and property now representing the same.

25. Further or in the further alternative, Sheikh Al Amoudi will contend as against Chadia Kassim:

    25.1    that the sum of £10 million (being the total of the amounts referred to in 15.1.1 and 15.2.2 above) was paid to Chadia Kassim and received by her:

       25.1.1   in breach of the fiduciary duty referred to in 19.1.1 above;

       25.1.2   in breach of the fiduciary duty referred to in 19.1.2 above;

25.2   that it is to be inferred from the matters referred to in 22.1 and 22.2 above that Chadia Kassim received that sum in the knowledge:

       25.2.1   that the same belonged to Sheikh Al Amoudi; and/or

       25.2.2   that the same had been paid to Chadia Kassim in breach of fiduciary duty;

25.3   further or in the alternative that in the circumstances it is unconscionable that Chadia Kassim should be allowed to retain that sum;

25.4   that in the circumstances Chadia Kassim holds on constructive trust and/or is liable to account to Sheikh Al Amoudi for:

       25.4.1   the sum of £10 million;

       25.4.2   all assets and property held by Chadia Kassim which were acquired directly or indirectly with the sum of £10 million, together with such assets and property now representing the same.

26.   Further or in the further alternative, Sheikh Al Amoudi will contend as against Negusse Hailu:

26.1   that the sums referred to in 17.3.2(3) above were  paid to Negusse Hailu and received by him:

       26.1.1   in breach of the fiduciary duty referred to in 19.1.1 above;

       26.1.2   in breach of the fiduciary duty referred to in 19.1.2 above;

26.2   that it is to be inferred from the matters referred to in 23.1 and 23.2 above that Negusse Hailu received those sums in the knowledge:

       26.2.1   that the same belonged to Sheikh Al Amoudi; and/or

26.2.2 that the same had been paid to Negusse Hailu in breach of fiduciary duty;

26.3 further or in the alternative that in the circumstances it is unconscionable that Negusse Hailu should be allowed to retain those sums;

26.4 that in the circumstances Negusse Hailu holds on constructive trust and/or is liable to account Sheikh Al Amoudi for:

26.4.1 the sum of US$556,324.05;

26.4.2 the sum of US$200,000;

26.4.3 the sum of US$400,000;

26.4.4 the sum of US$171,615.04;

26.4.5 all sums received by the HAK;

26.4.6 all assets and property held by Negusse Hailu which were acquired directly or indirectly with the such sums together with such assets and property now representing the same.

26A. In relation to Tigist Hailu:

26A.1 In the circumstances it is to be inferred that Tigist Hailu received the sums of US$452,540 and £103,000 knowing that it was Sheikh Al Amoudi's money and that it had been transferred to Tigist Hailu in breach of fiduciary duty.

26A.2 It would be unconscionable for Tigist Hailu to retain that sum and she is liable to account to Sheikh Al Amoudi for that sum on the basis of knowing receipt.

26B. In relation to the HAK:-

26B.1 In the circumstances it is to be inferred that the HAK received the sum of US$2,800,000 knowing that it was Sheikh Al Amoudi's money and that it had been transferred to the HAK in breach of fiduciary duty.

26B.2 It would be unconscionable for the HAK to retain that sum and it is liable to account to Sheikh Al Amoudi for that sum on the basis of knowing receipt.

26C. In relation to Ramiss:-

26C.1 In the circumstances it is to be inferred that Ramiss received the sums of US$1,100,000, US$50,000 and US$1,000,000 knowing that such sums were Sheikh Al Amoudi's money and that they had been transferred to Ramiss in breach of fiduciary duty.

26C.2 It would be unconscionable for Ramiss to retain these sums and it is liable to account to Sheikh Al Amoudi for such sums on the basis of knowing receipt.

## The Claim in Conspiracy

27. Further or in the further alternative, Sheikh Al Amoudi will contend:

27.1 that from a date or dates from early 1995 onwards Tamrat Layne unlawfully conspired with (amongst others) Mr Kassim, Chadia Kassim, Negusse Hailu, Tigist Hailu, the HAK and Ramiss to injure Sheikh Al Amoudi by unlawful means, namely:

27.1.1 effecting the misappropriations referred to in 15, 16 and 17 above and the deception referred to in 12 and 13 above; and

27.1.2 thereby defrauding Sheikh Al Amoudi;

27.2 that the existence of the conspiracy referred to in 27.1 above is to be inferred from the matters stated in 2.1, 4.1.1, 5, 9 to 13 and 15 to 17 above;

27.3 that in pursuance of the conspiracy referred to in 27.1 above, Tamrat Layne (together with (amongst others) Mr Kassim, Chadia Kassim, Negusse Hailu, Tigist Hailu, the HAK and Ramiss) committed that fraudulent misrepresentations and/or carried out such misappropriation.

The Claim for Damages

28.     In the circumstances, Sheikh Al Amoudi will contend that by reason of the deceit referred to in 12 and 13 above, the breaches of fiduciary duty referred to in 19 above and/or by reason of the tortious conspiracy referred to in 27.1 above, he has suffered loss and damage in the sum of US$16 million.

The Judgment of the Federal Supreme Court of Ethiopia

29.     Between 30 July 1997 and 14 March 2000 proceedings were brought in the Federal Supreme Court of Ethiopia against (amongst others) Mr Kassim, Tamrat Layne, Chadia Kassim and Negusse Hailu, including (as Count 1 of Charge I) a criminal charge (to which Mr Kassim, Chadia Kassim and Negusse Hailu were joined under Article 33 of the Regular Penal Code as alleged co-offenders with Tamrat Layne) relating to Tamrat Layne's receipt under false pretences of the sum of US$16 million from Sheikh Al Amoudi supposedly for settlement of a claim of the Ethiopian Trading Company.

30.     At the conclusion of the proceedings referred to in 29 above, the Supreme Court ordered:

        30.1    that the sum of US$6,443,447.95 (i.e. the amount of the payment referred to in 16.3.1 above) should be paid to Sheikh Al Amoudi by Mr Kassim;

        30.2    that the sum of US$9 million should be paid to Sheikh Al Amoudi by Chadia Kassim

        30.3    that the sum of US$556,324.05 (being the total amount of the payments referred to in 16.3.3 above together with the payment of US$74,084.84 to Hanzalamu) should be paid to Sheikh Al Amoudi by Negusse Hailu.

31.     31.1.   Despite the orders referred to in 30 above, neither Mr Kassim, Chadia Kassim nor Negusse Hailu has paid to Sheikh Al Amoudi the amount which was due from them to Sheikh Al Amoudi pursuant to those orders.

31.2    In the circumstances, Sheikh Al Amoudi will contend:

31.2.1 that the orders referred to in 30 above give rise (at common law) to foreign judgments for a definite sum of money;

31.2.2 that in the circumstances:

31.2.1 those orders may be enforced by claims in debt for the sums due under them;

31.2.2 Sheikh Al Amoudi is entitled to and hereby claims:

(1)    from Mr Kassim, the sum of US$6,443,47.95;

(2)    from Chadia Kassim, the sum of US$9 million;

(3)    from Negusse Hailu, the sum of US$556,324.05.

32.    Further, pursuant to section 35A of the Supreme Court Act, Sheikh Al Amoudi is entitled to, and hereby claims, interest (at such rate and for such period as the Court may think fit) on such sum and/or damages as may be awarded to him.

[Credit Agricole Indosuez

33.    At this time, Sheikh Al Amoudi does not make any substantive claim against Credit Agricole Indosuez, which has been joined to these proceedings solely for the purpose of seeking a disclosure order against it.]

AND Sheikh Al Amoudi claims:

1.    Against Mr Kassim:

(1)    (a)    under paragraph 14.3 above, the sum of US$16 million as money had and received; or

(b)    under paragraphs 16 and/or 17 above, the sums of US$6,443,447.95 and/or US$340,090.83 and/or US$2.8m and/or US$2.15m and/or

US$74,084.80 and/or US$93,000 and/or US$400,000 as money had and received; and/or

(2) under paragraphs 19 and 28, damages for breach of fiduciary duty; and/or

(3) (a) under paragraph 20.3:

    (i) a declaration that Mr Kassim holds the sum of US$16 million on constructive trust for Sheikh Al Amoudi; and

    (ii) an order for the payment by Mr Kassim to Sheikh Al Amoudi of the sum of US$16 million; or

(b) under paragraph 24:

    (i) a declaration that Mr Kassim holds on constructive trust for Sheikh Al Amoudi:-

        (A) the sum of US$16 million;

        (B) the sum of US$6,443,447.95; and

        (C) the sum of US$340,090.83; and

        (D) the sum of US$2.8m; and

        (E) the sum of US$2.15m; and

        (F) the sums of US$74,084.80 and/or US$93,000;

        (G) the sum of US$400,000; and

        (H) all assets and property held by Mr Kassim which were acquired directly or indirectly with such monies, together with all assets and property now representing the same.

    (ii) an order for the payment by Mr Kassim to Sheikh Al Amoudi of:

        (A) the sum of US$16 million; or

        (B) the sum of US$6,443,447.95; and/or

(C) the sum of US$340,090.83; and/or

(D) the sum of US$2.8m; and/or

(E) the sum of US$2.15m; and/or

(F) the sums of US$74,084.80 and/or US$93,000;

(G) the sum of US$400,000; and/or

(H) the assets and property referred to in (i)(G) above;

(4) under paragraphs 27 and 28 damages for fraudulent conspiracy in the sum of US$16 million; and/or

(5) under paragraphs 30 and 31, the sum of the sum of US$6,443,447.95; and/or

(6) under paragraph 32, interest.

2. Against Tamrat Layne

(1) under paragraphs 12, 13 and 28, damages for deceit; and/or

(2) under paragraphs 19 and 28, damages for breach of fiduciary duty; and/or

(3) under paragraph 21.3:

(a) a declaration that Tamrat Layne holds the sum of US$16 million on constructive trust for Sheikh Al Amoudi; and

(b) an order for the payment by Tamrat Layne to Sheikh Al Amoudi of the sum of US$16 million; and/or

(4) under paragraphs 27 and 28 damages for fraudulent conspiracy in the sum of US$16 million; and/or

(5) under paragraph 32, interest.

3. Against Chadia Kassim:

(1)     under paragraphs 15-17 above, the sum of £10 million as money had and received; and/or

(2)     (a)     under paragraph 22.3:

        (i)     a declaration that Chadia Kassim holds the sum of US$16 million on constructive trust for Sheikh Al Amoudi; and

        (ii)    an order for the payment by Chadia Kassim to Sheikh Al Amoudi of the sum of US$16 million; or

(b)     under paragraph 25:

        (i)     a declaration that Chadia Kassim holds on constructive trust for Sheikh Al Amoudi:

                (A)  the sum of £10 million;

                (B)  all assets and property held by Chadia Kassim which were acquired directly or indirectly with the sum of £10 million, together with such assets and property now representing the same.

        (ii)    an order for the payment by Chadia Kassim to Sheikh Al Amoudi of:

                (A)  the sum of £10 million;

                (B)  the assets and property referred to in (i)(B) above.

(3)     under paragraphs 27 and 28 damages for fraudulent conspiracy in the sum of US$16 million;

(4)     under paragraphs 30 and 31, the sum of the sum of US$9 million;

(5)     under paragraph 32, interest.

4.      Against Negusse Hailu:

(1)     under paragraphs 16 and/or 17 above, the sums of US$556,324.05, US$200,000, US$400,000, US$171,615.04, US$2.8m, and US$93,000 as money had and received; and/or

(2)     (a)     under paragraph 23.3:

             (i)     a declaration that Negusse Hailu holds the sum of US$16 million on constructive trust for Sheikh Al Amoudi; and

             (ii)    an order for the payment by Negusse Hailu to Sheikh Al Amoudi of the sum of US$16 million; or

       (b)     under paragraph 26:

             (i)     a declaration that Negusse Hailu holds on constructive trust for Sheikh Al Amoudi:-

                  (A)  the sum of US$556,324.05

                  (B)  the sums of US$200,000, US$400,000 and US$171,615.04

                  (C)  the sum of US$2.8m

                  (D)  the sum of US$93,000

                  (E)  all assets and property held by Negusse Hailu which were acquired directly or indirectly with such sums together with such assets and property now representing the same.

             (ii)    an order for the payment by Negusse Hailu to Sheikh Al Amoudi of:

                  (A)  the sums of US$556,324.05, US$200,000, US$400,000, US$171,615.04, US$2.8m and US$93,000; and/or

                  (B)  the assets and property referred to in (i)(E) above.

(3)     under paragraphs 27 and 28 damages for fraudulent conspiracy in the sum of US$16 million;

(4)     under paragraphs 30 and 31, the sum of the sum of US$556,324.05;

(5)     under paragraph 32, interest.

5.  Against Tigist Hailu:

(1)     under paragraphs 16 and/or 17 the sums of US$250,000, US$157,000, US$45,540, £10,000, £80,000, £3,000 and £10,000.

(2)     under paragraphs 16 and/or 17 a declaration that these sums and/or all assets or property acquired with such sums and/or all assets or property which now represent such sums are the property of Sheikh Al Amoudi and are held on constructive trust for him.

(3)     An order that Tigist Hailu do account to Sheikh Al Amoudi for the money, assets and property referred to in (1) and (2) above and do pay such sums to him as may be found to be due.

(4)     Under paragraphs 27 and 28 damages for conspiracy and /or compensation for dishonest assistance in breaches of trust and/or fiduciary duty.

(5)     Interest on all sums that may be found to be due in equity and/or pursuant to s35A of the Supreme Court Act 1981.

6.  Against the HAK:

(1)     Under paragraphs 16 and/or 17 the sum of US$2,800,000.

(2)     Under paragraphs 16 and/or 17 a declaration that this sums and/or all assets or property acquired with such sums and/or all assets or property which now represent such sums are the property of Sheikh Al Amoudi and are held on constructive trust for him.

(3)     An order that that the HAK do account to Sheikh Al Amoudi for the money, assets and property referred to in (1) and (2) above and do pay to him such sums as may be found to be due.

(4)     Under paragraph 27 and 28 damages for conspiracy.

(5)     Interest on all sums that may be found to be due in equity and/or pursuant to s35A of the Supreme Court Act 1981.

7.  Against Ramiss:

(1)     Under paragraph 16 and/or 17 the sum of US$2,150,000.

(2)     Under paragraph 16 and/or 17 a declaration that this sum and/or all assets or property acquired with such sum and/or all assets or property which now represent such sum are the property of Sheikh Al Amoudi and are held on constructive trust for him.

(3)     An order that that Ramiss do account to Sheikh Al Amoudi for the money, assets and property referred to in (1) and (2) above and do pay to him such sums as may be found to be due.

(4)     Under paragraph 27 and 28 damages for conspiracy.

(5)     Interest on all sums that may be found to be due in equity and/or pursuant to s35A of the Supreme Court Act 1981.

8.  Against Hanzalamu:

(1)     Under paragraphs 16 and/or 17 the sums of US$74,084.80 and US$93,000.

(2)     Under paragraphs 16 and/or 17 a declaration that these sums and/or all assets or property acquired with such sums and/or all assets or property which now represent such sums are the property of Sheikh Al Amoudi.

(3)     An order that Hanzalamu do account to Sheikh Al Amoudi for the money, assets and property referred to in (1) and (2) above and do pay such sums to him.

(4)     Interest on all sums that may be found to be due in equity and/or pursuant to s35A of the Supreme Court Act 1981.

9.  Against Mourad Ibrahim

(1)     Under paragraphs 16 and 17 the sums of US$10,000, US$20,000, £70,000, £53,036, £20,036 and £35,036.

44

(2)    Under paragraphs 16 and 17 a declaration that these sums and/or all assets or property which now represent such sums are the property of Sheikh Al Amoudi.

(3)    An Order that Mourad Ibrahim do account to Sheikh Al Amoudi for the money, assets and property referred to in (1) and (2) above and do pay such sums to him.

(4)    Interest on all sums that may be found to be due in equity and/or pursuant to s.35A of the Supreme Court Act 1981.

(Amended Particulars and Re-Amended Particulars)

EWAN MCQUATER

**Statement of Truth**

The Claimant believes that the facts stated in these Re-Re-Amended Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement.

Signed ........ *Marie Kidwell* ........

Marie Lisa Kidwell (Claimant's Solicitor)

<u>Re-Re-Amended Particulars of Claim by</u>
<u>Order of Mr Justice Rimer dated 14 May 2003</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**
**<u>CHANCERY DIVISION</u>**
**<u>CLAIM NO.HC02C02379</u>**
**BETWEEN:**

    **SHEIKH MOHAMMED AL AMOUDI**

**<u>Claimant</u>**

  **-and-**

**(1) HUSSEIN ABDULLAH KASSIM**

**<u>First Defendant</u>**

**(2) TAMRAT LAYNE**

**<u>Second Defendant</u>**

**(3) CHADIA NADIM KASSIM**

**<u>Third Defendant</u>**

**(4) NEGUSSE HAILU**

**<u>Fourth Defendant</u>**

**(5) BARCLAYS BANK PLC**

**<u>Fifth Defendant</u>**

**(6) TIGIST HAILU**

**<u>Sixth Defendant</u>**

**(7) THE HAK AND EZHAHARIA TRUSTS**

**<u>Seventh Defendant</u>**

**(8) RAMISS INTERNATIONAL LIMITED**

**<u>Eighth Defendant</u>**

**(9) HANZALAMU PRIVATE LIMITED COMPANY**

**<u>Ninth Defendant</u>**

**(10)  MOURAD IBRAHIM**

**<u>Tenth Defendant</u>**

**(11)  CREDIT AGRICOLE INDOSUEZ**

**<u>Eleventh Defendant</u>**

---

**RE-RE-AMENDED PARTICULARS
OF CLAIM**

---

## **EXHIBIT B**

## **The Habte English Action**

**1.** Amended Claim form dated 25 October 2002 (claim no. HC02C01245).

**2.** Amended Particulars of claim dated 25 October 2002 (claim no. HC02C01245).

**1.** Amended Claim form dated 25 October 2002 (claim no. HC02C01245).

*Amended Pursuant To The Order of Mr Justice Park Dated 25th October 2002*

## Claim Form

In the | High Court of Justice
Queen's Bench Division
Chancery

Claim No. HC02C01245

**Claimant**
Sheikh Mohammed Al Amoudi
P.O BOX 5387
JEDDAH 21422
SAUDI ARABIA

**Defendants**

Hiwot Habte
57 Gilbey House
38-46 Jamestown Road, Camden, London NW1 7BY

Barclays Bank plc
54 Lombard Street
London EC3P 3AH

SEAL
31 OCT 2002

**Brief details of claim**

1. The Claimant's claim against the First Defendant arises out of and/or in connection with the transfer of a sum of US$16 million by the Claimant to Hussain Abdullah Kassim (the First Defendant's husband) on or about 10 April 1995.

2. The transfer was made by the Claimant acting under a mistake and the monies at all times remained the property of the Claimant.

3. Part of the sum of US$16 million referred to in paragraph 1 above was paid or transferred to the First Defendant. The Claimant claims to trace that part of the sum of US$16 million which was paid or transferred to the First Defendant in law (as money had and received) and/or in equity. Further or alternatively the First Defendant has been unjustly enriched by the receipt of such sum or sums.
(a) The Claimant claims against the First Defendant on the basis of knowing receipt or dealing and in respect of the First Defendant's dishonest assistance in breach of fiduciary duty in relation to the sum of US$16 million.
(b). The First Defendant further claims against the First Defendant damages for conspiracy relating to the misappropriation of the sum of US$16 million in and after April 1995.

4. The Claimant accordingly seeks:-
(a) An order that an account be taken of what sums were received by the Defendant out of the sum of US$16 million referred to in paragraph 1 above;
(b) An order that the Defendant do pay to the Claimant such sums as are found to be due to the Claimant on the taking of the account referred to in (a) above;
(c) A declaration that monies received by the Defendant out of the sum of US$16 million referred to in paragraph 1 above constitute monies had and received by the Defendant to the use of the Claimant;
(d) A declaration that monies received by the Defendant out of the sum of US$16 million referred to in paragraph 1 above and/or the proceeds thereof and/or any assets on which such sums or any part thereof have been expended constitute in equity the property of the Claimant;
(e) An order that the Defendant do make restitution to the Claimant of the sums referred to above and/or the proceeds thereof and/or any assets on which the said sums or any part thereof have been expended;
(f) A declaration that the First Defendant holds those sums out of the US$16 million which she has received as constructive trustee on behalf of the Claimant and an order that she make restitution of those sums to the Claimant.
(g) Damages for conspiracy.
(h) Damages and/or compensation for the First Defendant's dishonest assistance in breaches of fiduciary duty.
(i) Interest pursuant to section 35A of the Supreme Court Act 1981 and/or in equity;
(j) All necessary accounts, enquiries and directions.
(k) Further or other relief.
(l) Costs

The Claimant makes no substantive claim against the Second Defendant which has been joined for the purpose of seeking disclosure against it.

**Value**

The Claimant expects to recover more than £15,000.

Does, or will, your claim include any issues under the Human Rights Acts 1998    ☐ Yes ☒ No

# Particulars of Claim

To follow

We (the solicitors for the Claimant) hereby certify that the rate current in London for the purchase of US$16,000,000 at close of business on [—30th]24th October 2002+ (i.e. the date immediately before the date of issue of the Amended Claim Form) was US$[ +1.557+.42 to the pound sterling and at this rate US$16,000,000 amounts to £[——10,276,172]+1,267,605.

---

Statement of Truth

* The Claimant believes that the facts stated in these particulars of claim are true.

* I am duly authorised by the Claimant(s) to sign this statement

Full name           Stephen Pearson

Name of Claimant's solicitor's firm        Gouldens, 10 Old Bailey, London EC4M 7NG

signed                                position or office held      Partner

*                                     (if signing on behalf of firm or company)

*delete as appropriate

---

Gouldens
10 Old Bailey
London  EC4M 7NG
DX 67 London/Chancery
(Ref: SJP/SLA/JLL/856781)
Tel: 020 7583 7777
Fax: 020 7583 6777
email: sjp@gouldens.com

Claimant's or Claimant's solicitor's address to which
documents or payments should be sent if different from
overleaf including (if appropriate) details of DX, fax or
e-mail

---

**Defendant's name and address**

Hiwot Habte
57 Gilbey House
38 - 46 Jamestown Road
Camden
London NW1 7BY

| | £ |
|---|---|
| Amount Claimed | Unspecified |
| Court Fee | 620.00 |
| Solicitor's costs | To be assessed |
| Total amount | |
| Issue date | 3+25 October 200*+ |

N1 Claim form (CPR Part 7)                        © Crown copyright reproduced by Gouldens 11/00        SJP/MB/885157/1252448.01

**Further information may be obtained from the court in a series of free leaflets.**

- Please read all of these guidance notes before you begin completing the claim form. The notes follow the order in which information is required on the form.

- Court staff can help you fill in the claim form and give information about procedure once it has been issued. But they cannot give legal advice. If you need legal advice, for example, about the likely success of your claim or the evidence you need to prove it, you should contact a solicitor or a Citizens Advice Bureau.

- If you are filling in the claim form by hand, please use black ink and write in block capitals.

- Copy the completed claim form and the Defendant's notes for guidance so that you have one copy for yourself, one copy for the court and one copy for each Defendant. Send or take the forms to the court office with the appropriate fee. The court will tell you how much this is.

---

You must fill in the heading of the form to indicate whether you want the claim to be issued in a county court or in the High Court. (The High Court means either a District Registry (attached to a county court) or the Royal Courts of Justice in London). There are restrictions on claims which may be issued in the High Court (see 'Value' overleaf).

Use whichever of the following is appropriate:

'In the ……………….……County Court'
(inserting the name of the court)

**or**

'In the High Court of Justice ……….. Division'
(inserting e.g. 'Queen's Bench' or 'Chancery' as appropriate

……………………………….. District Registry'
(inserting the name of the District Registry)

**or**

'In the High Court of Justice ………. Division,
(inserting e.g. Queen's Bench' or 'Chancery' as appropriate)
Royal Courts of Justice'

---

As the person issuing the claim, you are called the 'Claimant'; the person you are suing is called the 'Defendant'. Claimants who are under 18 years old (unless otherwise permitted by the court) and patients within the meaning of the Mental Health Act 1983, must have a litigation friend to issue and conduct court proceedings on their behalf. Court staff will tell you more about what you need to do if this applies to you.

You must provide the following information about yourself **and** the Defendant according to the capacity in which you are suing and in which the Defendant is being sued.

When suing or being sued as:-

**an individual:**

All known forenames and surname, whether Mr, Mrs, Miss, Ms or Other (e.g. Dr) and residential address (**including** postcode and telephone number) in England and Wales. Where the Defendant is a proprietor of a business, a partner in a firm or an individual sued in the name of a club or other unincorporated association, the address for service should be the usual or last know place of residence or principal place of business of the company, firm or club or other unincorporated association.

---

**Where the individual is:**

**under 18** write '(a child by Mr Joe Bloggs his litigation friend)' after the name. If the child is conducting proceedings on their own behalf write '(a child)' after the child's name.

**a patient within the meaning of the Mental Health Act 1983** write '(by Mr Joe Bloggs his litigation friend)' after the patient's name.

**trading under another name**

you must add the words 'trading as' and the trading name e.g. 'Mr John Smith trading as Smith's Groceries'.

**suing or being sued in a representative capacity**

you must say what that capacity is e.g. 'Mr Joe Bloggs as the representative of Mrs Sharon Bloggs (deceased)'.

**suing or being sued in the name of a club or other unincorporated association**

add the words 'suing/sued on behalf of' followed by the name of the club or other unincorporated association.

**a firm**

enter the name of the firm followed by the words ' a firm' e.g. 'Bandbox - a firm' and an address for service which is either a partner's residential address or the principal or last known place of business.

**a corporation (other than a company)**

enter the full name of the corporation and the address which is either its principal office or any other place where the corporation carries on activities and which has a real connection with the claim.

**a company registered in England and Wales**

enter the name of the company and an address which is either the company's registered office or any place of business that has a real, or the most, connection with the claim e.g. the shop where the goods were bought.

**an overseas company (defined by s744 of the Companies Act 1985)**

enter the name of the company and either the address registered under s691 of the Act or the address of the place of business having a real, or the most, connection with the claim.

© Crown copyright  reproduced by Gouldens  05/00

**Note: The facts and full details about your claim and whether or not you are claiming interest, should be set out in the 'particulars of claim' (*see note under 'Particulars of Claim'*).**
You must set out under this heading:

- a concise statement of the nature of your claim
- the remedy you are seeking e.g. payment of money; an order for return of goods or their value; an order to prevent a person doing an act; damages for personal injuries.

If you are claiming **a fixed amount of money** (a 'specified amount') write the amount in the box at the bottom right-hand corner of the claim form against 'amount claimed'.

If you are *not* claiming a fixed amount of money (an 'unspecified amount') under 'Value' write "I expect to recover" followed by whichever of the following applies to your claim:

- "not more than £5,000" or
- "more than £5,000 but not more than £15,000" or
- "more than £15,000"

If you are **not able** to put a value on your claim, write "I cannot say how much I expect to recover".

**Personal Injuries**
If your claim is for 'not more than £5,000' and includes a claim for personal injuries, you must also write "My claim includes a claim for personal injuries and the amount I expect to recover as damages for pain, suffering and loss of amenity is" followed by either:

- "not more than £1,000" or
- "more than £1,000"

**Housing disrepair**
If your claim is for 'not more than £5,000' and includes a claim for housing disrepair, relating to residential premises, you must also write "My claim includes a claim against my landlord for housing disrepair relating to residential premises. The cost of the repairs or other work is estimated to be" followed by either:

- "not more than £1,000" or
- "more than £1,000"

If within this claim, you are making a claim for other damages, you must also write:

"I expect to recover as damages" followed by either:

- "not more than £1,000" or
- "more than £1,000"

You may only issue in the High Court if one of the following statements applies to your claim:-

"By law, my claim must be issued in the High Court. The Act which provides this is ........... (specify Act)"

**or**

"I expect to recover more than £15,000"

**or**
"My claim includes a claim for personal injuries and the value of the claim is £50,000 or more"

**or**   "My claim needs to be in a specialist High Court list, namely ................................. (state which list)".

If one of the statements does apply and you wish to, or must by law, issue your claim in the High Court, write the words "I wish my claim to issue in the High Court because" followed by the relevant statement e.g. "I wish my claim to issue in the High Court because my claim includes a claim for personal injuries and the value of my claim is £50,000 or more".

Enter in this box the full names and address of the Defendant receiving the claim form (ie. one claim form for each Defendant). If the Defendant is to be served outside England and Wales, you may need to obtain the court's permission.

You may include your particulars of claim on the claim form in the space provided or in a separate document which you should head 'Particulars of Claim'. It should include the names of the parties, the court, the claim number and your address for service and also contain a statement of truth. You should keep a copy for yourself, provide one for the court and one for each Defendant. Separate particulars of claim can either be served;

- with the claim form or.
- within 14 days after the date on which the claim form was served.

If your particulars of claim are served separately from the claim form, they must be served with the forms on which the Defendant may reply to your claim.
**Your particulars of claim must include**

- a concise statement of the facts on which you rely
- a statement (if applicable) to the effect that you are seeking aggravated damages or exemplary damages
- details of any interest which you are claiming
- any other matters required by your type of claim as set out in the relevant practice direction

Insert in this box the address at which you wish to receive documents and/or payments, if different from the address you have already given under the heading 'Claimant'. The address must be in England or Wales. If you are willing to accept service by DX, fax or e-mail, add details.

This must be signed by you, by your solicitor or your litigation friend, as appropriate.
Where the Claimant is a registered company or a corporation the claim must be signed by either the director, treasurer, secretary, chief executive, manager or other officer of the company or (in the case of a corporation) the mayor, chairman, president or town clerk.

© Crown copyright reproduced by Gouldens 05/00

**Please read these notes carefully - they will help you decide what to do about this claim.**
**Further information may be obtained from the court in a series of free leaflets.**

- If this claim form was received with the particulars of claim completed or attached, you must reply within 14 days of the date it was served on you. If the words 'particulars of claim to follow' are written in the particulars of claim box, you should not reply until after you are served with the particulars of claim (which should be no more than 14 days after you received the claim form). If the claim was sent by post, the date of service is taken as the second day after posting (see post mark). If the claim form was delivered or left at your address, the date of service will be the day after it was delivered.

- You may either
  - pay the amount claimed
  - admit that you owe all or part of the claim and ask for time to pay or
  - dispute the claim

- If you do not reply, judgment may be entered against you.

- The notes below tell you what to do.

- The response pack will tell you which forms to use for your reply. (The pack will accompany the particulars of claim if they are served after the claim form.)

- Court staff can help you complete the forms of reply and tell you about court procedures. But they cannot give legal advice. If you need legal advice, for example about the likely success of disputing the claim, you should contact a solicitor or a Citizens Advice Bureau immediately.

**Registration of Judgments:** If the claim results in a judgment being made against you in a **county court**, your name and address may be entered in the Register of County Court Judgments. This may make it difficult for you to obtain credit.

**Costs and Interest:** Additional costs and interest may be added to the amount claimed on the front of the claim form if judgment is entered against you. In a county court, if judgment is for £5,000 or more, or is in respect of a debt which attracts contractual or statutory interest for late payment, the Claimant may be entitled to further interest.

### How to pay

Do not bring any payments to the court - they will not be accepted.

When making payments to the Claimant, quote the Claimant's reference (if any) and the claim number.

Make sure that you keep records and can account for any payments made. Proof may be required if there is any disagreement. It is not safe to send cash unless you use registered post.

### Claim for specified amount

**If you admit all the claim,** take or send the money, including any interest and costs, to the Claimant at the address given for payment on the claim form, within 14 days.

**If you admit all the claim and you are asking for time to pay,** complete Form N9A and send it to the Claimant at the address given for payment on the claim form, within 14 days. The Claimant will decide whether to accept your proposal for payment. If it is accepted, the Claimant may request the court to enter judgment against you and you will be sent an order to pay. If your offer is not accepted, the court will decide how you should pay.

**If you admit only part of the claim,** complete Form N9A and Form N9B (see 'Disputing the Claim' overleaf) and send them to the court within 14 days. The Claimant will decide whether to accept your part admission. If it is accepted, the Claimant may request the court to enter judgment against you and the court will send you an order to pay. If you part admission is not accepted, the case will proceed as a defended claim.

### Claim for unspecified amount

**If you admit liability for the whole claim but do not make an offer to satisfy the claim,** complete Form N9C and send it to the court within 14 days. A copy will be sent to the Claimant who may request the court to enter judgment against you for an amount to be decided by the court, and costs. The court will enter judgment and refer the court file to a judge for directions for management of the case. You and the Claimant will be sent a copy of the court's order.

**If you admit liability for the claim and offer an amount of money to satisfy the claim,** complete Form N9C and send it to the court within 14 days. The Claimant will be sent a copy and asked if the offer is acceptable. The Claimant must reply to the court within 14 days and send you a copy. If a reply is not received, the claim will be stayed. If the amount you have offered is **accepted** -

- the Claimant may request the court to enter judgment against you for that amount.
- if you have requested time to pay which is not accepted by the Claimant, the rate of payment will be decided by the court.

© Crown copyright reproduced by Gouldens 05/00

If your offer in satisfaction is **not accepted** -

- the Claimant may request the court to enter judgment against you for an amount to be decided by the court, and costs;  and

- the court will enter judgment and refer the court file to a judge for directions for management of the case.  You and the Claimant will be sent a copy of the court's order.

**If you are being sued as an individual for a specified amount of money and you dispute the claim,** the claim may be transferred to your home court i.e. the one nearest your home or your solicitor's practice if different from the court where the claim was issued.

**If you need longer than 14 days to prepare your defence or to contest the court's jurisdiction to try the claim,** complete the Acknowledgment of Service form and send it to the court within 14 days.  This will allow you 28 days from the date of service of the particulars of claim to file your defence or make an application to contest the court's jurisdiction.  The court will tell the Claimant that your Acknowledgment of Service has been received.

**If the case proceeds as a defended claim,** you and the Claimant will be sent an Allocation Questionnaire.  You will be told the date by which it must be returned to the court.  The information you give on the form will help a judge decide whether your case should be dealt with in the small claims track, fast track or multi-track.  After a judge has considered the completed questionnaires, you will be sent a notice of allocation setting out the judge's decision.  The notice will tell you the track to which the claim has been allocated and what you have to do to prepare for the hearing or trial.  **Leaflets telling you more about the tracks are available from the court office.**

**Claim for specified amount**

**If you wish to dispute the full amount claimed or wish to claim against the Claimant (a counterclaim),** complete Form N9B and send it to the court within 14 days.

**If you admit part of the claim,** complete the Defence Form N9B **and** the Admission Form N9A and send them both to the court within 14 days.  The Claimant will decide whether to accept your part admission in satisfaction of the claim (see under 'Admitting the Claim - specified amount').  If the Claimant does not accept the amount you have admitted, the case will proceed as a defended claim.

**If you dispute the claim because you have already paid it,** complete Form N9B and send it to the court within 14 days.  The Claimant will have to decide whether to proceed with the claim or withdraw it and notify the court and you within 28 days.  If the Claimant wishes to proceed, the case will proceed as a defended claim.

**Claim for unspecified amount/return of goods/non-money claims**

**If you dispute the claim or wish to claim against the Claimant (counterclaim),** complete Form N9D and send it to the court within 14 days.

**Personal injuries claims:**

**If the claim is for personal injuries and the Claimant has attached a medical report to the particulars of claim, in your defence you should state whether you:**

- agree with the report **or**

- dispute all or part of the report **and** give your reasons for doing so **or**

- neither agree nor dispute the report **or** have no knowledge of the report.

Where you have obtained your own medical report, you should attach it to your defence.

**If the claim is for personal injuries and the Claimant has attached a schedule of past and future expenses and losses, in your defence you must state which of the items you:**

- agree **or**

- dispute **and** supply alternative figures where appropriate **or**

- neither agree nor dispute or have no knowledge of.

This must be either your solicitor's address, your own residential or business address in England and Wales or (if you live elsewhere) some other address within England and Wales.

This must be signed by you, by your solicitor or your litigation friend, as appropriate.

Where the Defendant is a **registered company or a corporation** the response must be signed by either the director, treasurer, secretary, chief executive, manager or other officer of the company or (in case of a corporation) the mayor, chairman, president or town clerk.

© Crown copyright  reproduced by Gouldens  05/00

**Please read these notes carefully - they will help you decide about this claim.  You will have received a notice of hearing telling you when and where to come to court with the claim form.  A leaflet is available from the court office about what happens when you come to a court hearing.**

- You must reply to the claim form within 14 days of the date it was served on you.  If the claim form was

  - sent by post, the date of service is taken as the second day after posting (see post mark)

  - delivered or left at your address, the date of service will be the day after it was delivered

  - handed to you personally, the date of service will be the day it was given to you

- You may either

  - pay the amount claimed

  - admit liability for the claim and offer to make payments to keep the goods

  - dispute the claim

- If you do not reply or attend the hearing, judgment may be entered against you.

- The notes below tell you what to do.

- Court staff can help you complete the forms of reply and tell you about court procedure.  But they cannot give legal advice.  If you need legal advice, for example about the likely success of disputing the claim, you should contact a solicitor or a Citizens Advice Bureau immediately.

**Registration of Judgments**: If the claim results in a judgment being made against you in a **county court**, your name and address may be entered in the Register of County Court Judgments.  This may make it difficult for you to obtain credit.

**Costs and Interest**: Additional costs and interest may be added to the amount claimed on the front of the claim form if judgment is entered against you.  In a county court, if judgment is for £5,000 or more, or is in respect of a debt which attracts contractual or statutory interest for late payment, the Claimant may be entitled to further interest.

---

Do not bring any payments to the court - they will not be accepted.

When making payments to the Claimant, quote the Claimant's reference (if any) and the claim number.

Make sure that you keep records and can account for any payments made.  Proof may be required if there is any disagreement.  It is not safe to send cash unless you use registered post.

**If you admit liability for the claim and offer to make payments in order to keep the goods.**  Complete Form N9C and send it to the court within 14 days.  **Remember** to keep a copy for yourself.  The court will send a copy of your admission to the Claimant and ask if your offer is acceptable.

If the Claimant **accepts your offer** and asks the court to enter the judgment before the date of the hearing, you will be sent a copy of the judgment and need not come to the hearing.  If you do not hear from the court it is in your interests to attend the hearing.

If your offer is **not accepted**, you should attend the hearing.  The court will treat your admission as evidence so remember to bring a copy of your admission with you to the hearing.

**If you dispute the claim or wish to claim against the Claimant (counterclaim)**, complete Form N9D and send it to the court within 14 days.  **Remember** to keep a copy for yourself and to bring it with you to the hearing.  The court will send a copy of your defence to the Claimant.  At the hearing the court may make a final order or judgment in the claim.  If the court agrees that you have a valid defence (or counterclaim), it will tell you and the Claimant what to do to prepare for a future hearing.  If you send your defence to the court after the 14 days has expired, and you want to rely on it at the hearing, the court may take your failure to file it on time into account when deciding what order to make in respect of costs.

This must be signed by you, by your solicitor or your litigation friend, as appropriate.

Where the Defendant is a **registered company or a corporation** the response must be signed by either the director, treasurer, secretary, chief executive, manager or other officer of the company **or** (in the case of a corporation) the mayor, chairman, president or town clerk.

© Crown copyright  reproduced by Gouldens  05/00

SJP/MB/885157/1252448.01

**2.** Amended Particulars of claim dated 25 October 2002 (claim no. HC02C01245).

**AMENDED PURSUANT TO THE ORDER OF MR JUSTICE PARK DATED 25
OCTOBER 2002**

~~Claim No HC02C01245Q01X04501~~

**IN THE HIGH COURT OF JUSTICE
CHANCERY~~QUEEN'S BENCH~~ DIVISION**

**B E T W E E N:**

**SHEIKH MOHAMMED AL AMOUDI**

**Claimant**

**and**

**(1) HIWOT HABTE**

**First Defendant**

**and**

**(2) BARCLAYS BANK PLC**

**Second Defendant**

---

**AMENDED PARTICULARS OF CLAIM**

---

**The parties**

1. The Claimant ("Sheikh Al Amoudi") is a citizen and resident of Saudi Arabia and a major foreign investor in Ethiopia. He is and was at all material times a customer of ABN Amro bank in Geneva ("ABN Amro") maintaining account no. 107476/001/12 with that bank.

2. The First Defendant ("Hiwot Habte") was at all material times the wife of Mr Kassim, who is identified further below.

**Barclays**

3. The Second Defendant Barclays Bank Plc ("Barclays") is and was at all material times a bank carrying on business at its branch in Ascot, sort code 20-02-53 ("the Ascot branch").

Until about November 1994 Barclays carried on business at its branch in Virginia Water, sort code 20-89-48 ("the Virginia Water branch"). Until about April 1996 Barclays also carried on business at its Kensington branch, sort code 20-45-48 ("the Kensington branch") which then merged into its new Kensington and Chelsea "cluster", sort code 20-47-34 ("the Kensington and Chelsea branch"). At all material times Barclays also carried on business at its branch at Westminster, sort code 20-94-48 ("the Westminster branch").

**Mr Kassim**

4. On or about 26 October 1993 Mr Hussain Abdullah Kassim ("Mr Kassim") opened an account no. 80540218 with Barclays at the Virginia Water branch.

5. On or about 19 November 1994 when the Virginia Water branch closed, Mr Kassim's account was transferred to the Ascot branch and a new account number 60540218 was allocated to his account. On or about 26 April 1995 Mr Kassim's account was transferred to the Kensington branch and another new account number 00254703 was allocated. On or about 20 April 1996 the account was transferred to the Kensington and Chelsea branch under account number 20254703. This account (in its various locations) will be referred to throughout as "Mr Kassim's sterling account".

**The US$16m payment**

6. On 5 April 1995 Sheikh Al Amoudi instructed ABN Amro to make a payment of US$16m on 10 April 1995 to Barclays, Ascot branch, sort code 20-02-53, account no. 60540218.

7. On 7 April 1995 ABN Amro sent a swift message to Barclays informing it of the intended transfer. ABN Amro's message stated that the transaction date was 10 April 1995, the amount was US$16m and that the correspondent banks through which the payment was to be made were ABN Amro New York and Barclays New York. The message gave the sort code of the recipient branch as 20-02-53 and gave the beneficiary account number as 60540218.

8. On 10 April 1995 ABN Amro transferred the sum of US$16m to Barclays and on or about 10 April 1995 Barclays credited the sum of £10,003,119.98 (the sterling equivalent of US$16m) to Mr Kassim's sterling account. The previous balance on Mr Kassim's sterling account was £5.79. Following this credit, the balance was £10,003,125.77.

**The fraud**

9. The US$16m payment was in fact part of a fraud on Sheikh Al Amoudi perpetrated by Mr Kassim and others, particulars of which are set out below:-

   (a) On 5 April 1995 Sheikh Al Amoudi met in Addis Ababa with Mr Tamrat Layne who was then the Prime Minister of Ethiopia ("Mr Layne"). Sheikh Al Amoudi has known Mr Layne since about early 1992. Mr Layne informed Sheikh Al Amoudi that an unspecified foreign company had a claim of US$32m against the Ethiopian government and that the Government was now obliged to settle such claim. Mr Layne requested that Sheikh Al Amoudi fund US$16m to settle such claim on the basis that the Ethiopian Government would provide to him a quantity of coffee beans.

   (b) Sheikh Al Amoudi agreed to Mr Layne's request. Mr Layne directed Sheikh Al Amoudi to make the payment of US$16m by telegraphic transfer and provided Sheikh Al Amoudi with the account number, sort code and branch details of the branch at Barclays to which the monies should be transferred, but did not inform Sheikh Al Amoudi of the identity of the account holder.

   (c) Following this meeting, Sheikh Al Amoudi gave the instructions to ABN Amro referred to above.

(d) On 10 April 1995 ABN Amro transferred the sum of US$16m to Barclays. On that date Barclays sent a swift message to ABN Amro stating as follows:-

> *"VERY VERY URGENT. RE YOUR SWIFT MT100 DATED 7.4.95 VALUE 10.4.95 REFERENCE 04/24272/MH/ZVA FOR US$16000000 IN FAVOUR OF A/C 60540218. PLEASE PROVIDE BENEFICIARYS EXACT NAME AND DETAILS OF THIS TRANSACTION. WE HOLD PAYMENT AWAITING YOUR REPLY. PLEASE REPLY ATTN MARTIN KING CNTL 256151/7.4.95."*

(e) Following an enquiry (made by Sheikh Al Amoudi on or shortly after 10 April 1995) as to the exact name of the beneficiary of the payment, Mr Layne informed Sheikh Al Amoudi by means of a handwritten fax dated 19 April 1995 that the recipient of the payment was "Ethiopian Trading Company". Sheikh Al Amoudi passed this information on to ABN Amro, which passed it to Barclays on 19 April 1995.

(f) In fact the representations made by Mr Layne were untrue and were made fraudulently. At all material times Mr Layne intended that the US$16m payment should be misappropriated by Mr Kassim, Chadia Nadim Kassim ("Chadia Kassim"), Negusse Hailu and possibly others as well. The beneficiary of the US$ 16m payment was not the "Ethiopian Trading Company" but Mr Kassim.

(g) Chadia Kassim was Mr Layne's mistress. Mr Kassim is Chadia Kassim's son. Hiwot Habte is Mr Kassim's wife. Pursuant to the fraud, Mr Kassim and Chadia Kassim have caused various transfers and payments to be made out of the sum of US$16m.

(h) Between 30 July 1997 and 14 March 2000 proceedings ("the Ethiopian criminal proceedings") were brought in the Federal Supreme Court of Ethiopia against (amongst others) Mr Kassim, Mr Layne, Chadia Kassim and Negusse Hailu including a criminal charge (to which Mr Kassim, Chadia Kassim and Negusse Hailu were joined under Article 33 of the Regular Penal Code as alleged co-offenders with Mr Layne) relating to

the US$16m transfer from Sheikh Al Amoudi supposedly for settlement of a claim of Ethiopian Trading Company.

(i) At the conclusion of the Ethiopian criminal proceedings each of Mr Layne, Mr Kassim, Chadia Kassim and Negusse Hailu were found guilty of the fraud relating to the US$16m payment and were given various sentences of imprisonment and fines. Mr Kassim was also ordered to pay the sum of US$6,443,447.95 to Sheikh Al Amoudi, Chadia Kassim was ordered to pay a sum of US$9m to Sheikh Al Amoudi and Negusse Hailu was ordered to pay a sum of US$556,324.05 to Sheikh Al Amoudi. These sums have not been paid to Sheikh Al Amoudi.

(j) Sheikh Al Amoudi has so far been unsuccessful in recovering any part of the US$16m payment. Sheikh Al Amoudi is pursuing proceedings in England against Mr Kassim, Mr Layne, Chadia Kassim and Negusse Hailu in claim no. HC02C02379HQ 0100236. The Ethiopian Government has also requested assistance from the Swiss authorities in the Ethiopian criminal proceedings and criminal proceedings are ongoing in relation to this fraud in Switzerland. The Ethiopian Government has blocked funds standing to the credit of two accounts in the name of Chadia Kassim in Geneva ("the Geneva Accounts") with respect thereto.

(k) On 4 July 2001, Sheikh Al Amoudi's Swiss legal advisers filed a request with the Tribunal de Première Instance in Geneva to obtain a freezing order (a "séquestre") over the Geneva accounts referred to above in favour of Sheikh Al Amoudi. On 5 July 2001, the Court in Geneva granted such freezing order in favour of Sheikh Al Amoudi over the funds in such accounts.

**Transactions involving Hiwot Habte**

10. Hiwot Habte received part of the monies misappropriated from Sheikh Al Amoudi in the circumstances described below:-

(a) On or about 12 or 13 April 1995 Barclays transferred the US dollar equivalent of £7m from Mr Kassim's sterling account (out of the US$16m received from Sheikh Al Amoudi) to Banque Indosuez Mer Rouge ("BIMR"), Djibouti for the credit of account no. 65773 500 0004 ("the Djibouti account"). The beneficiary of the transfer was not identified. The Djibouti account was in fact an account of Chadia Kassim. The US dollar sum transferred was about US$11,141,902800.

(b) On 18 April 1995 a further sum of £2m out of the US$16m payment from Sheikh Al Amoudi was debited to Mr Kassim's sterling account pursuant to a cheque no. 100004.

(c) The payee of that cheque was Hiwot Habte and on 19 April 1995 the proceeds of the cheque were credited to Hiwot Habte's Student account no. 60430722 at the Westminster branch ("Hiwot Habte's account").

(d) Shortly thereafter Hiwot Habte gave instructions to Barclays to transfer the sum of £2m to "to the account of Mr H.A. Kassim at Barclays Bank Kensington - sort code 20 45 48" adding that the account to be credited was "Sundry Persons at Kensington 38020027" ("the Sundry Persons Account"). The Sundry Persons Account was credited with that sum on the same day. Mr Kassim's account with Barclays' Premier Banking Unit at the Kensington branch.

(e) On 19 April 1995 Mr Kassim gave Barclays instructions that upon receipt of the £2m, that sum should be added to his call deposit with Barclays Finance Company, Jersey ("FinCo").

(f) On or shortly after 21 April 1995 Barclays placed a sum of £2,950,000 (which ~~probably~~ comprised the £2m transferred by Hiwot Habte together with a further sum of £950,000 from Mr Kassim's account) on deposit in Mr Kassim's name with FinCo.

(g) On 19 May 1995 Barclays transferred a sum of £3m <u>(substantially comprising the £2,950,000</u> ~~from the monies on~~ <u>deposited</u> in Mr Kassim's name with FinCo <u>together with a further sum of £45,000 from Mr Kassim's sterling account)</u> to BIMR, Djibouti for the credit of the Djibouti account, the beneficiary on this occasion being named as Chadia Kassim. This was the same account to which the £7m had been transferred on 12 or 13 April 1995.

(h) <u>Chadia Kassim made various transfers out of the monies which had been transferred to her in Djibouti. Among the transfers were the following.</u> On 30 May 1995 Barclays received a sum of US$340,090.93 from BIMR, Djibouti by order of Chadia Kassim followed by a further sum of US$6,443,438.29 on 31 May 1995 from the same bank and remitter. Both sums were received for the credit of a dollar account no. 82059600 held by Mr Kassim at the Kensington and Chelsea branch ("Mr Kassim's dollar account") and were thereafter placed on fixed term deposit in Mr Kassim's name maturing on 14 July 1995. <u>The monies so received by Mr Kassim were subsequently transferred or paid by him to various recipients (including himself). Among the transfers or payments he made were some or all of the payments referred to in (i)-(k) below.</u>

(i) A series of payments were made from Mr Kassim's sterling account from May 1995 onwards into Hiwot Habte's account. Some of these were funded by payments from Mr Kassim's dollar account (to which some of the proceeds of the fraud had been credited as explained above). Details of these payments are included in the schedule hereto.

(j) From September 1995 payments were also made directly from Mr Kassim's dollar account into Hiwot Habte's account. Other payments were also made by Mr Kassim into Hiwot Habte's account. Details of these payments are included in the schedule hereto.

(k) On 2 January 1996 and 13 November 1998 Hiwot Habte also made payments to Mr Kassim out of her account of £6,450 and £1,910 respectively.

## Claims against Hiwot Habte

### The tracing claim/monies had and received

11. The transfer of US$16m was made by Sheikh Al Amoudi acting under a mistake, namely in the mistaken belief that the representations made to him by Mr Layne were true. In the premises the monies at all times remained the property of Sheikh Al Amoudi.

12. Part of the sum of US$16 million was paid or transferred to Hiwot Habte as described above. Sheikh Al Amoudi claims to trace that part of the sum of US$16 million which was paid or transferred to Hiwot Habte in law (as money had and received) and/or in equity. Further or alternatively Hiwot Habte has been unjustly enriched by the receipt of such sum or sums and Sheikh Al Amoudi claims restitution of such sums.

### The claim for dishonest assistance and/or knowing receipt or dealing

13. In the circumstances referred to in paragraph 9 above, Mr Layne owed Sheikh Al Amoudi a fiduciary duty to use the sum of US$16m for the purpose indicated by Mr Layne at the meeting on 5 April 1995, and to ensure that neither the sum of US$16m nor any part of it was used for the wrongful gain of himself or anyone associated with him.

14. Further or in the alternative the consciences of Mr Layne and Mr Kassim were subject to a fiduciary duty to respect the proprietary right of Sheikh Al Amoudi referred to in paragraph 11 above.

15. In causing Sheikh Al Amoudi to make the payment referred to in paragraph 6 above and in causing the proceeds of that payment to be used in the manner described in paragraphs 9 and 10 above, Mr Layne acted in breach of fiduciary duty.

16. In failing to return the sum of US$16m or the sums referred to in paragraphs 10(h) above, and by causing or permitting the sum of US$16m to be dealt with in the manner described in paragraphs 9 and 10 above, Mr Kassim acted in breach of fiduciary duty.

17. In receiving, paying and giving instructions for the payment of the monies as described in paragraph 10 above in the circumstances described in paragraph 12 above Hiwot Habte assisted the breaches of fiduciary duty by Mr Layne and Mr Kassim.   Further some of the monies misappropriated in breach of fiduciary duty were paid to Hiwot Habte and/or for her own benefit.

18. It is to be inferred from the following matters that, in assisting such breaches of duty by Mr Layne and/or Mr Kassim, Hiwot Habte acted dishonestly.  Further or alternatively it would in the circumstances be unconscionable for her to retain the benefit of the monies she has received.

    (a) Hiwot Habte was at all material times Mr Kassim's wife.

    (b) She received a sum of £2 million into her student account, apparently without explanation.

    (c) She quickly gave instructions for that sum to be paid out for her husband's benefit, thereby helping her husband to launder these monies and/or helping to conceal their origin.

    (d) At a meeting with Sheikh Al Amoudi's solicitors (represented by Ms Charleson and Ms Lamb) on 16 July 2001, Hiwot Habte failed to disclose her receipt of this sum. On the

contrary she laughed at the suggestion that anyone would have paid her such a sum, when she in fact knew that she had received such a sum and paid it on for Mr Kassim's benefit.

(e) She continued to receive substantial sums from her husband and others (some £2.4 million between about 1995 and 1999), contrary to her statements to Sheikh Al Amoudi's solicitors at the meeting referred to above that she and her husband were living on handouts and certain commission payments.

(f) She made payments out of her account totalling about £2.3 million between about 1995 and 1998 contrary to her claim made to Sheikh Al Amoudi's solicitors at the meeting referred to above that she and her husband were living on handouts and certain commission payments.

(g) She informed Sheikh Al Amoudi's solicitors that she did not travel much with her husband after April 1995. However she in fact made a large number of foreign trips with Mr Kassim after April 1995 which may well have related to or been connected with the dissipation of the monies.

(h) Since her meeting with Sheikh Al Amoudi's solicitors she has sold her London flat and appears to travel frequently. She may also have tried to conceal her interest or involvement with other assets by misspelling her name (as detailed in the first affidavit of Stephen Pearson paragraph 101).

19.   By reason of Hiwot Habte's assistance in the breaches of fiduciary duty referred to above Sheikh Al Amoudi has suffered loss and damage and/or requires to be compensated in the sum of US$16 million.

The claim in conspiracy

20. From about April 1995 onwards Hiwot Habte conspired with Mr Layne and/or Mr Kassim and/or others to injure Sheikh Al Amoudi by the use of unlawful means and/or with intent to injure Sheikh Al Amoudi:-

(a)  Paragraphs 6-18 above are repeated.

(b)  It is to be inferred from the involvement of Mr Layne, Mr Kassim, Hiwot Habte and others that the acts complained of above were carried out pursuant to some agreement or combination between them and with intent to injure Sheikh Al Amoudi.

(c)  The conspiracy involved the use of unlawful means in that:-

(i)  Mr Layne and Mr Kasssim acted in breach of their fiduciary duties as set out above.

(ii)  Hiwot Habte knowingly assisted in those breaches of duty.

(iii)  The conspiracy involved the theft of monies from Sheikh Al Amoudi.

(iv)  Hiwot Habte and others knowingly received monies removed from Sheikh Al Amoudi in breach of fiduciary duty.

21.  By reason of such conspiracy Sheikh Al Amoudi has suffered loss and damage in the sum of US$16 million.

~~13.~~22.  Sheikh Al Amoudi further claims interest on all sums which may be found to be due to him pursuant to section 35A of the Supreme Court Act 1981 and/or in equity at such rate and for such period as the Court thinks fit.

<u>Barclays Bank Plc</u>

23. <u>Sheikh Al Amoudi does not make any substantive claim against Barclays, which has been joined solely for the purpose of seeking disclosure orders against it.</u>

<u>AND THE CLAIMANT CLAIMS AGAINST THE FIRST DEFENDANT:-</u>

(1)     An order that an account be taken of what sums were received by the <u>First</u> Defendant out of the sum of US$16 million referred to in paragraph 8 above.

<u>(2)</u>     An order that the <u>First</u> Defendant do pay to the Claimant such sums as are found to be due to the Claimant on the taking of the account referred to in (1) above.

<u>(3)</u>     A declaration that monies received by the <u>First</u> Defendant out of the sum of US$16 million referred to in paragraph 8 above constitute monies had and received by the <u>First</u> Defendant to the use of the Claimant.

<u>(4)</u>     A declaration that monies received by the <u>First</u> Defendant out of the sum of US$16 million referred to in paragraph 8 above and/or the proceeds thereof and/or any assets on which such sums or any part thereof have been expended constitute in equity the property of the Claimant.

<u>(5)</u>     An order that the <u>First</u> Defendant do make restitution to the Claimant of the sums referred to above and/or the proceeds thereof and/or any assets on which the said sums or any part thereof have been expended.

<u>(6)</u>     <u>A declaration that the First Defendant holds those sums out of the US$16 million which she has received as constructive trustee on behalf of the Claimant and an order that she make restitution of those sums to the Claimant.</u>

<u>(7)</u>     <u>Damages for conspiracy.</u>

(8)      Damages and/or compensation for the First Defendant's dishonest assistance in breaches of fiduciary duty.

(10)     Interest pursuant to section 35A of the Supreme Court Act 1981 and/or in equity.

(11)     All necessary accounts, enquiries and directions.

(12)     Further or other relief.

(13)     Costs.

AGAINST THE SECOND DEFENDANT:-

(14)     Such orders for disclosure as may in the circumstances be appropriate.

                                                                EWAN McQUATER

                                                                EWAN McQUATER

Statement of Truth

Sheikh Al Amoudi believes that the facts stated in these Amended Particulars of Claim are true.

.......................................................

Dated this 31st day of October 20021.

SERVED this 26th day of October 2001 by Messrs Gouldens of 10 Old Bailey, London EC4M 7NG, Solicitors for the Claimant

RE SERVED 31st day of October 2002 by Messrs Gouldens of 10 Old Bailey, London EC4M 7NG, Solicitors for the Claimant

## SCHEDULE

| Date | Amount (£) | Transfer from |
|------|-----------|---------------|
| (1) 19 May 1995 | 1,000 | Mr Kassim's sterling account |
| (2) 7 August 1995 | 6,186 | Mr Kassim's sterling account |
| (3) 23 August 1995 | 20,000 | Mr Kassim's sterling account |
| (4) 13 September 1995 | 12,795.90 | Mr Kassim dollar account |
| (5) 27 September 1995 | 6,333.12 | Mr Kassim dollar account |
| (6) 19 October 1995 | 30,000 | Mr Kassim \47301 |
| (7) 7 November 1995 | 7,000 | Mr Kassim's sterling account |
| (8) 12 December 1995 | 14,000 | Mr Kassim's sterling account |
| (9) 18 December 1995 | 6,000 | Mr Kassim's dollar account |
| (10) 3 January 1996 | 6,426 | Mr Kassim's dollar account |
| (11) 25 January 1996 | 9,693.05 | Mr Kassim's dollar account |
| (12) 23 July 1996 | 5,000 | Mr Kassim's dollar account |
| (13) 11 October 1996 | 3,173.60 | Mr Kassim's dollar account |
| (14) 11 February 1997 | 79,990.13 | Mr Kassim / 259699/BSUIGB2L |
| (154) 21 July 1997 | 125 | Mr Kassim |

The transfers from Mr Kassim's account at items (2), (3) and (7) were backed by transfers from Mr Kassim's dollar account.

Claim No HC02C01245Q01X04501

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY**QUEEN'S BENCH
**DIVISION**

B E T W E E N:

**SHEIKH MOHAMMED AL AMOUDI**

**Claimant**

**and**

**(1) HIWOT HABTE**

**First Defendant**

**(2) BARCLAYS BANK PLC**

**Second Defendant**

---

**AMENDED PARTICULARS OF
CLAIM**

---

Gouldens
10 Old Bailey
London EC4M 7NG
Tel: 020 7583 7777
Fax: 020 7583 6777
Ref:-SJP/SLA/JLL/885157

## **EXHIBIT C**

1. Freezing injunction dated 6 March 2001 – Order to restrain assets world-wide of Mr. Justice Colman against Hussein Kassim (claim no. HQ0100236).

2. Freezing Injuction dated 18 September 2002 - Order to restrain assets world-wide of Mr Justice Tomlison against Hiwot Habte (claim no. HC02C01245).

3. Freezing Injuction dated 18 September 2002 - Order to restrain assets world-wide of Mr Justice Tomlison against Negusse Hailu (claim no. HC02C02379).

1. Freezing injunction dated 6 March 2001 – Order to restrain assets world-wide of Mr.
   Justice Colman against Hussein Kassim (claim no. HQ0100236).

## FREEZING INJUNCTION
## ORDER TO RESTRAIN ASSETS WORLDWIDE

### IN THE HIGH COURT OF JUSTICE

### CLAIM NO:HQ0100236

**QUEEN'S BENCH DIVISION**

**THE HONOURABLE MR JUSTICE COLMAN**

**B E T W E E N**

### SHEIKH MOHAMMED AL AMOUDI

**Claimant/Applicant**

**-and-**

**(1) HUSSAIN ABDULLAH KASSIM**

**First Defendant/Respondent**

**(2) TAMRAT LAYNE**

**Second Defendant**

**(3) CHADIA NADIM KASSIM**

**Third Defendant**

**(4) NEGUSSE HAILU**

**Fourth Defendant**

**(5)    BARCLAYS BANK PLC**

**Fifth Defendant**

**TO:**

Mr Hussain Abdullah Kassim of Flat 57, Gilbey House, 38 Jamestown Road, London NW1.

## PENAL NOTICE

**IF YOU THE WITHIN NAMED RESPONDENT DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO IMPRISONMENT OR FINED OR YOUR ASSETS SEIZED**

### NOTICE TO THE RESPONDENT

**You should read the terms of the Order and the Guidance Notes very carefully.**

This Order prohibits you, Hussain Abdullah Kassim ("The Respondent"), from dealing with your assets up to the amount stated in the Order, but subject to any exceptions set out at the end of the Order. You have a right to ask the Court to vary or discharge this order.

If you disobey this Order you may be found guilty of Contempt of Court and may be sent to prison or fined.

### THE ORDER

An application was made today, 6 March 2001, by the Solicitor for the Applicant to the Honourable Mr Justice Colman who heard the application. The Judge read the Orders of Mr Justice Owen dated 18 January 2001, Mr Justice Pitchford dated 25 January 2001, Mr Justice Henriques dated 8 February 2001 and Mr Justice MacKay dated 27 February 2001, the affidavits listed in Schedule A and the letter dated 5 March 2001 from the Respondent's Solicitors and accepted the undertakings set out in Schedule B at the end of this Order. As a result of the application **IT IS ORDERED** that until further order:-

1.　　The Respondent must not in any way dispose of or deal with or diminish the value of any of his assets outside England or Wales whether in his own name or not and whether solely or jointly owned up to the value of US$18,000,000.

2.　　This prohibition includes the following assets in particular:-

　　　2.1　　any money that the Respondent may have in any bank account, whether at Barclays Bank Jersey Branch, (sort code: 23-45-00) account number 059478/001 or at Banque IndoSuez in Geneva, account number 1052018M or elsewhere.

2.2    The property known as 1003 Wharton Road, Mount Laurel, New Jersey, NJ08054 or the net sale money after payment of any mortgages if it has been sold.

3.    Exceptions to the Order referred to in paragraph 1 above:-

3.1    This Order does not prohibit the Respondent from spending £1,000 a week towards his ordinary living expenses and also a reasonable sum on legal advice and representation in accordance with paragraph 4.1 of the Order made by Mr Justice Henriques on 8 February 2001 . But before spending any money held by him outside England and Wales the Respondent must tell the Applicant's legal representatives where the money is to come from.

3.2    The Respondent may agree with the Applicant's legal representatives that this Order should be varied in any respect, but any agreement must be in writing.

3.3    The Respondent may cause this order (and the order made by Mr Justice Henriques on 8 February 2001) to cease to have effect if he provides security by paying the sum of US$18,000,000 into Court or makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

4.    The Costs of this application be reserved.

## GUIDANCE NOTES

### Effect of this Order

A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

## Variation or discharge of this Order

The Respondent (or anyone notified of this Order) may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Applicant's legal representatives.

## Parties other than the Applicant and Respondent

1. **Effect of this Order:-**

   It is a Contempt of Order for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be sent to prison, fined or have his assets seized.

2. **Effect of this Order outside England and Wales:-**

   The terms of this Order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable by or is enforced by a Court in the relevant country and then they are to affect him only to the extent they have been declared enforceable or have been enforced UNLESS the person is:

   (i)     a person to whom this Order is addressed or an officer or an agent appointed by power of attorney of that person; or

   (ii)    a person who is subject to the jurisdiction of this Court and (a) has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court and (b) is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order.

3. **Set off by Banks:-**

   This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to The Respondent before it was notified of this Order.

4.   **Withdrawals by The Respondent:-**

No bank need enquire as to the application or proposed application of any money withdrawn by The Respondent if the withdrawal appears to be permitted by this Order.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this Order should be sent to Room WG34, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The telephone number is 020 7947 6009. The offices are open between 10 am and 4.30 pm Monday to Friday.

## SCHEDULE A

**Affidavits:-**

The Applicant relied on the affidavits of Marie Lisa Kidwell sworn on 12 January 2001 and 23 February 2001 (on behalf of the Applicant).

## SCHEDULE B

### Undertakings given to the Court by the Applicant:-

(1)     If the Court later finds that this Order has caused loss to the Respondent and decides that the Respondent should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(2)     The Applicant has caused a written guarantee in the sum of US\$ 500,000.00 to be issued from Credit Suisse Private Banking London, such guarantee being in respect of any Order the Court may make in respect of paragraph (1) above and in respect of any order which the Court may make in respect of paragraph (1) of Schedule B to the order made by Mr Justice Henriques on 8 February 2001.

(3)     As soon as practicable the Applicant will serve on the Respondent this Order together with an Application for the Return date and copies of the evidence relied on by the Applicant.

(4)     Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(5)     The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of the Respondent assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(6)     If for any reason this Order ceases to have effect (including in particular where the Respondent provides security as provided for above), the Applicant will forthwith take all reasonable steps to inform, in writing, any person or company to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order, that it has ceased to have effect.

(7)     The Applicant will not without leave of the Court begin proceedings against the Respondent in any other jurisdiction or use information obtained as a result of an Order of the Court in this jurisdiction for the purpose of civil or criminal proceedings in any other jurisdiction other than proceedings now current in Switzerland.

(8)     The Applicant will not without the leave of the Court seek to enforce this Order in any
        country outside England and Wales.

**Name and Address of Applicant's Legal Representatives**

The Applicant's Legal Representatives are:-

Denton Wilde Sapte
5 Chancery Lane
Clifford's Inn
London EC4A 1BU

Tel: 020 7242 1212 (24 hours)
Fax: 020 7404 0087
Ref: JMM/MLK/44084.00001

**2.** Freezing Injuction dated 18 September 2002 - Order to restrain assets world-wide of Mr Justice Tomlison against Hiwot Habte (claim no. HC02C01245).

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MR JUSTICE TOMLINSON**

18 September 2002

**BETWEEN:**



**Claim No. HC02C01245**

### SHEIKH MOHAMMED AL AMOUDI

**Claimant/Applicant**

**and**

### (1) HIWOT HABTE

**First Defendant/First Respondent**

### (2) BARCLAYS BANK PLC

**Second Defendant/Second Respondent**

---

### FREEZING INJUNCTION
### ORDER TO RESTRAIN ASSETS WORLDWIDE

---

TO:   Ms Hiwot Habte of 3 Eagle Court, Rosedale Road, Dulwich, London SE21 8RE.

Barclays Bank plc of 54 Lombard Street, London EC3P 3AH.

### PENAL NOTICE

**IF YOU THE WITHIN NAMED FIRST RESPONDENT DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO IMPRISONMENT OR FINED ON YOUR ASSETS SEIZED**

**NOTICE TO THE RESPONDENTS**

SJP/MB/882793/1237965.01

2

**You should read the terms of the Order and the Guidance Notes very carefully. You are advised to consult a Solicitor as soon as possible.**

This Order prohibits you, Hiwot Habte, ("The First Respondent") from dealing with your assets up to the amount stated in the Order, but subject to any exceptions set out at the end of the Order. You have a right to ask the Court to vary or discharge this order.

If you disobey this Order you may be found guilty of Contempt of Court and may be sent to prison or fined. In the case of a Corporate Respondent, it may be fined, its directors be sent to prison or fined or its assets may be seized.

**THE ORDER**

An application was made today, 18 September 2002, by Counsel for the Applicant to Mr Justice Tomlinson who heard the application. The Judge read the affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order. As a result of the application **IT IS ORDERED** that until Friday 25 October 2002:-

1.       The First Respondent must not (i) remove from England and Wales any of her assets which are in England and Wales whether in her own name or not and whether solely or jointly owned up to the value of US$18,000,000, or (ii) in any way dispose of or deal with or diminish the value of any of her assets in or outside England or Wales whether in her own name or not and whether solely or jointly owned up to the same value.

2.       This prohibition includes but is not limited to the following assets:-   .

2.1      any money that the First Respondent may have in any bank account, whether at

2.1.1    Barclays Bank (including but not limited to account numbers 40837172, 60430722, 10940143, 3094143, 74779844, 68573777, 47965666),

3

2.1.2      Halifax (including but not limited to account numbers 00278301 and 00357055)

2.2      A Mercedes car with registration number H1 HUN

3.      If the total unencumbered value of the First Respondent's assets in England and Wales exceeds US$18,000,000 the First Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of her assets still in England and Wales remains above US$18,000,000.

4.      The First Respondent must:-

4.1      Inform the Applicant in writing within 7 days after this Order has been served on her of all her assets in England and Wales and whether in her own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. The First Respondent maybe entitled to refuse to provide some or all of this information on the grounds that it may incriminate her.

4.2      Confirm the information in an affidavit which must be served on the Applicant's legal representatives within 10 days after this Order has been served on the First Respondent.

5.      Exceptions to the Order referred to in paragraph 1 above:-

5.1      This Order does not prohibit the First Respondent from spending £1,000 a week towards such expenses as she may have in England and Wales and also a reasonable sum on legal advice and representation. But before spending any money the First Respondent must tell the Applicant's legal representatives where the money is to come from.

4

5.2     The First Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this Order should be varied in any other respect, but any agreement must be in writing.

5.3     The First Respondent may cause this order to cease to have effect if she provides security by paying the sum of US$18,000,000 into Court or makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

6.      Inspection of Bank Records held by the Second Respondent ("Barclays")

6.1     Barclays must provide to the Applicant's solicitors within 7 days the following information in relation to all accounts which are of have been held at any time since 1 March 1995 by or in the name of the First Respondent at Barclays (including its branches at Kensington & Chelsea) whether such accounts are held in the First Respondent's sole name or jointly:

        (a)     the name of the account;

        (b)     the account number

        (c)     the name of the authorised signatories for the account

6.2     Barclays must permit the Applicant to inspect and take copies of

        (a)     all entries in the books and all records held (whether held in documentary or electronic form) relating to any accounts of the sort referred to in paragraph 6.1 above

        (b)     all correspondence between the Barclays and the First Respondent and correspondence with third parties regarding the First Respondent

5

(c)     all cheques drawn on any account of the sort referred to in paragraph 6.1 above

(d)     all debit vouchers, transfer applications and orders and internal memoranda relating to any account of the sort referred to in 6.1 above

(e)     copies of statements for any accounts of the sort referred to in 6.1 above (whether the statements are stored by Barclays in paper form, or must be recovered from computer records and/or microfiche)

as from the date of the opening of the account to the date of inspection by the Applicant.

6.3     On receiving a request from the Applicant's solicitors to inspect and take copies of the documents of the sort referred to in paragraph 6.2 above, Barclays is to be allowed a period of 10 working days (or such longer period as the Applicant's legal advisers may agree in writing) in which to make such documents available for inspection.

7.     the Claimant has permission to use documents disclosed in these proceedings in Claim Number HC02C02379 or in any proceedings commenced against the Defendants to that action in Switzerland, Cyprus, France and/or the USA.

8.     The Costs of this application be reserved.

6

## GUIDANCE NOTES

### Effect of this Order

A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

### Variation or discharge of this Order

The First Respondent and Barclays Bank (or anyone notified of this Order) may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Applicant's legal representatives.

### Parties other than the Applicant and Respondents

1.     **Effect of this Order:-**

It is a Contempt of Order for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be sent to prison, fined or have his assets seized.

2.     **Set off by Banks:-**

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to The First Respondent before it was notified of this Order.

7

3.    **Assets situated outside England and Wales:-**

In respect of assets situated outside England and Wales, nothing in this Order shall prevent a third party from complying with what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country in which those assets are situated or any Orders of the Courts of that country.

3.    **Withdrawals by The First Respondent:-**

No bank need enquire as to the application or proposed application of any money withdrawn by The First Respondent if the withdrawal appears to be permitted by this Order.

8

## INTERPRETATION OF THIS ORDER

(1)     In this Order, where there is more than one Respondent (unless otherwise stated) references to "the Respondent" means both or all of them.

(2)     a requirement to serve on "the Respondent" means on each of them. However, the Order is effective against any Respondent on whom it is served.

(3)     an Order requiring "the Respondent" to do or not to do anything applies to all Respondents.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this Order should be sent to the Clerk to Judge in Chambers, Chancery Division, Royal Courts of Justice, The Strand, London WC2A 2LL quoting the case number. The telephone number is 020 7947 6009. The offices are open between 10 am and 4.30 pm Monday to Friday.

9

## SCHEDULE A

**Affidavits:-**

The Applicant relied on the first affidavit of Stephen James Pearson sworn on 17 September 2002 (on behalf of the Applicant).

10

## SCHEDULE B

**Undertakings given to the Court by the Applicant:-**

(1)     If the Court later finds that this Order has caused loss to the First Respondent and decides that the First Respondent should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(2)     The Applicant has caused a written guarantee in the sum of US$ 500,000.00 to be issued in favour of the First Respondent, Hussein Kassim and Negusse Hailu, such guarantee being in respect of any Order the Court may make in respect of paragraph (1) above. The Applicant will cause a copy of that guarantee to be served forthwith on the First Respondent.

(3)     As soon as practicable the Applicant will serve this Order on the Respondents, an Application for the Return Date and copies of the evidence relied on by the Applicant.

(4)     Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(5)     The Applicant will pay the reasonable costs of anyone other than the First Respondent which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of the First Respondent assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(6)     If for any reason this Order ceases to have effect (including in particular where the First Respondent provides security as provided for above), the Applicant will forthwith take all reasonable steps to inform, in writing, any person or company to whom it has given notice of this Order, or who it has reasonable

11

grounds for supposing may act upon this Order, that it has ceased to have effect.


**Name and Address of Applicant's Legal Representatives**

The Applicant's Legal Representatives are:-

Gouldens
10 Old Bailey
London EC4M 7NG

Tel: 020 7583 7777
Fax: 020 7583 6777
Ref: SJP/JLL/856781/1237576.01

Claim No. HC02C01245

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
MR JUSTICE TOMLINSON
BETWEEN:

SHEIKH MOHAMMED AL AMOUDI

Claimant/Applicant

and

(1) HIWOT HABTE

First Defendant//First Respondent

(2) BARCLAYS BANK PLC

Second Defendant/Second Respondent

---

**FREEZING INJUNCTION
ORDER TO RESTRAIN ASSETS
WORLDWIDE**

---

Gouldens
10 Old Bailey
London
EC4M 7NG

Ref: SJP/882793/1237965
Tel: 020 7583 7777
Fax: 020 7583 6777

**3.** Freezing Injuction dated 18 September 2002 - Order to restrain assets world-wide of
Mr Justice Tomlison against Negusse Hailu (claim no. HC02C02379).

**IN THE HIGH COURT OF JUSTICE**       **CLAIM NO. HC02C02379**

**CHANCERY DIVISION**

**MR JUSTICE TOMLINSON**

18 September 2002

**BETWEEN:**

### SHEIKH MOHAMMED AL AMOUDI

<u>Claimant</u>

and

| | | |
|---|---|---|
| (1) | **HUSSEIN ABDULLAH KASSIM** | |
| | | <u>First Defendant</u> |
| (2) | **TAMRAT LAYNE** | |
| | | <u>Second Defendant</u> |
| (3) | **CHADIA NADIM KASSIM** | |
| | | <u>Third Defendant</u> |
| (4) | **NEGUSSE HAILU** | |
| | | <u>Fourth Defendant/First Respondent</u> |
| (5) | **BARCLAYS BANK PLC** | |
| | | <u>Fifth Defendant/Second Respondent</u> |
| (6) | **TIGIST HAILU** | |
| | | <u>Sixth Defendant/Third Respondent</u> |
| (7) | **THE HAK AND EZHAHARIA TRUSTS** | |
| | | <u>Seventh Defendant</u> |
| (8) | **RAMISS INTERNATIONAL LIMITED** | |
| | | <u>Eighth Defendant</u> |
| (9) | **HANZALAMU PVT LIMITED CO** | |
| | | <u>Ninth Defendant</u> |

---

### FREEZING INJUNCTION
### ORDER TO RESTRAIN ASSETS WORLDWIDE

---

TO:     Mr Negusse Hailu of Addis Ababa Prison Administration, Addis Ababa, Ethiopia.

       Barclays Bank plc of 54 Lombard Street, London EC3P 3AH.

       Tigist Hailu of Apartment 14L, 1320 New York Avenue, New York 10021, USA.

2

**PENAL NOTICE**

**IF YOU THE WITHIN NAMED RESPONDENT DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO IMPRISONMENT OR FINED ON YOUR ASSETS SEIZED**

**NOTICE TO THE RESPONDENTS**

**You should read the terms of the Order and the Guidance Notes very carefully. You are advised to consult a Solicitor as soon as possible.**

This Order prohibits you, Negusse Hailu, ("the First Respondent"), from dealing with your assets up to the amount stated in the Order, but subject to any exceptions set out at the end of the Order. You have a right to ask the Court to vary or discharge this order.

If you disobey this Order you may be found guilty of Contempt of Court and may be sent to prison or fined. In the case of a Corporate Respondent, it may be fined, its directors be sent to prison or fined or its assets may be seized.

**THE ORDER**

An application was made today, 18th September 2002, by Counsel for the Applicant to Mr Justice Tomlinson who heard the application. The Judge read the affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order. As a result of the application **IT IS ORDERED** that until further Order:-

1.      The First Respondent must not (i) remove from England and Wales any of his assets which are in England and Wales whether in his own name or not and whether solely or jointly owned up to the value of US$18,000,000, or (ii) in any way dispose of or deal with or diminish the value of any of his assets in or outside England or Wales whether in his own name or not and whether solely or jointly owned up to the same value.

3

2.      If the total unencumbered value of the First Respondent's assets in England and Wales exceeds US$18,000,000 then the First Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of its assets still in England and Wales remains above US$18,000,000.

3.      The First Respondent must:-

3.1     Inform the Applicant in writing within 7 days after this Order has been served on him of all his assets and whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. The First Respondent may be entitled to refuse to provide some or all of this information on the grounds that it may incriminate him.

3.2     Confirm the information in an affidavit which must be served on the Applicant's legal representatives within 10 days after this Order has been served on the Respondent.

4.      Exceptions to the Order referred to in paragraph 1 above:-

4.1     This Order does not prohibit the First Respondent from spending £1,000 a week towards such expenses as he may have in England and Wales and also a reasonable sum on legal advice and representation. But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

4.2     The First Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this Order should be varied in any other respect, but any agreement must be in writing.

4.3     The First Respondent may cause this order to cease to have effect if he provides security by paying the sum of US$18,000,000 into Court or makes provision for

4

security in that sum by another method agreed with the Applicant's legal representatives.

5.        Inspection of Bank Records held by Barclays Bank plc

5.1      Barclays must provide to the Applicant's solicitors within 7 days the following information in relation to all accounts which are of have been held at any time since 1 March 1995 by or in the name of the First Respondent, the Third Respondent, Holbeach Limited and Mirfleed Limited (collectively "the Disclosure Order Respondents") at Barclays whether such accounts are held in the Disclosure Order Respondents' sole name or jointly:

          (a)     the name of the account;

          (b)     the account number

          (c)     the name of the authorised signatories for the account

5.2      Barclays must permit the Applicant to inspect and take copies of

          (a)     all entries in the books and all records held (whether held in documentary or electronic form) relating to any accounts of the sort referred to in paragraph 5.1 above;

          (b)     all correspondence between Barclays and the Disclosure Order Respondents and Barclays and third parties regarding the Disclosure Order Respondents.

          (c)     all cheques drawn on any account of the sort referred to in paragraph 5.1 above;

5

(d)     all debit vouchers, transfer applications and orders and internal memoranda relating to any account of the sort referred to in 5.1 above

(e)     copies of statements for any accounts of the sort referred to in 5.1 above (whether the statements are stored by Barclays in paper form, or must be recovered from computer records and/or microfiche)

as from the date of the opening of the account to the date of inspection by the Applicant.

5.3     On receiving a request from the Applicant's solicitors to inspect and take copies of the documents of the sort referred to in paragraph 5.2 above, Barclays is to be allowed a period of 10 working days (or such longer period as the Applicant's legal advisers may agree in writing) in which to make such documents available for inspection.

6.      The Costs of this application be reserved.

6

## GUIDANCE NOTES

### Effect of this Order

A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

### Variation or discharge of this Order

The Respondent and Barclays Bank (or anyone notified of this Order) may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Applicant's legal representatives.

### Parties other than the Applicant and Respondents

1.    **Effect of this Order:-**

It is a Contempt of Order for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be sent to prison, fined or have his assets seized.

2.    **Set off by Banks:-**

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Respondents before it was notified of this Order.

3.    **Assets situated outside England and Wales:-**

·    In respect of assets situated outside England and Wales, nothing in this Order shall prevent a third party from complying with what it reasonably believes to

7

be its obligations, contractual or otherwise, under the laws and obligations of the country in which those assets are situated or any Orders of the Courts of that country.

4.     **Withdrawals by The First Respondent:-**

No bank need enquire as to the application or proposed application of any money withdrawn by the First Respondent if the withdrawal appears to be permitted by this Order.

8

## INTERPRETATION OF THIS ORDER

(1)     In this Order, where there is more than one Respondent (unless otherwise stated) references to "the Respondent" means both or all of them.

(2)     a requirement to serve on "the Respondent" means on each of them. However, the Order is effective against any Respondent on whom it is served.

(3)     an Order requiring "the Respondent" to do or not to do anything applies to all Respondents.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this Order should be sent to the Clerk to Judge in Chambers, Chancery Division, Royal Courts of Justice, The Strand, London WC2A 2LL quoting the case number. The telephone number is 020 7947 6009. The offices are open between 10 am and 4.30 pm Monday to Friday.

9

## SCHEDULE A

**Affidavits:-**

The Applicant relied on the first affidavit of Stephen James Pearson sworn on 17 September 2002 (on behalf of the Applicant).

10

## SCHEDULE B

**Undertakings given to the Court by the Applicant:-**

(1)     If the Court later finds that this Order has caused loss to the Respondent and decides that the Respondent should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(2)     The Applicant will cause a written guarantee in the sum of US$ 500,000.00 to be issued in favour of the First Respondent, Hussein Kassim and Hiwot Habte, such guarantee being in respect of any Order the Court may make in respect of paragraph (1) above. The Applicant will cause a copy of that guarantee to be served forthwith on the First Respondent.

(3)     As soon as practicable the Applicant will serve this Order on the Respondents, an Application for the return date and copies of the evidence relied on by the Applicant.

(4)     Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(5)     The Applicant will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of the Respondents' assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any Order the Court may make.

(6)     If for any reason this Order ceases to have effect (including in particular where the Respondent provides security as provided for above), the Applicant will forthwith take all reasonable steps to inform, in writing, any person or company

11

to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order, that it has ceased to have effect.

**Name and Address of Applicant's Legal Representatives**

The Applicant's Legal Representatives are:-

Gouldens
10 Old Bailey
London EC4M 7NG

Tel:  020 7583 7777
Fax:  020 7583 6777
Ref:  SJP/JLL/856781/1237576.01

<u>Claim No.  HQ0100236</u>
<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>MR JUSTICE TOMLINSON</u>
BETWEEN:

SHEIKH MOHAMMED AL AMOUDI

<u>Claimant</u>

and

|     |                                        |                                          |
|-----|----------------------------------------|------------------------------------------|
| (1) | HUSSAIN ABDULLAH KASSIM                | <u>First Defendant</u>                   |
| (2) | TAMRAT LAYNE                           | <u>Second Defendant</u>                  |
| (3) | CHADIA NADIM KASSIM                    | <u>Third Defendant</u>                   |
| (4) | NEGUSSE HAILU                          | <u>Fourth Defendant/First Respondent</u> |
| (5) | BARCLAYS BANK PLC                      | <u>Fifth Defendant/Second Respondent</u> |
| (6) | TIGIST HAILU                           | <u>Sixth Defendant/Third Respondent</u>  |
| (7) | THE HAK AND EZHAHARIA TRUSTS           | <u>Seventh Defendant</u>                 |
| (8) | RAMISS INTERNATIONAL LIMITED           | <u>Eighth Defendant</u>                  |
| (9) | HANZALAMU PVT LIMITED CO               | <u>Ninth Defendant</u>                   |

---

**FREEZING INJUNCTION
ORDER TO RESTRAIN ASSETS
WORLDWIDE**

---

Gouldens Ref: SJP/856781/1237576.01
10 Old Bailey
London
EC4M 7NG
Tel: 020 7583 7777
Fax: 020 7583 6777

## **EXHIBIT D**

Ex-Parte Order for Discovery for use in English High Court Proceedings dated June 27, 2003
- Southern District of New York, United States District Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*RAKOF,*
*PART.*

--------------------------------------------------------------------- x

IN THE MATTER OF THE APPLICATION FOR      :
DISCOVERY FOR USE IN PROCEEDINGS BEFORE   :   Civ. Action No.  *M19-96*
THE ENGLISH HIGH COURT OF JUSTICE BETWEEN  :
MOHAMMED AL AMOUDI,                        :   **EX-PARTE ORDER FOR**
                                          :   **DISCOVERY FOR USE IN**
          CLAIMANT,                       :   **ENGLISH HIGH COURT**
                                          :   **PROCEEDINGS**
          – AND –                         :
                                          :
HUSSEIN ABDULLAH KASSIM ET AL.,           :
DEFENDANTS, CLAIM Nos. HC02C02379 and     :
HC02C01245.                               :

--------------------------------------------------------------------- x

Upon the filing of an ex-parte application by Mr. Mohammed Al Amoudi for an

order, pursuant to 28 U.S.C. § 1782 and Rules 30 and 45 of the Federal Rules of Civil Procedure,

issuing subpoenas to persons residing in or who can be found in this judicial district that

command those persons to appear at depositions upon oral examination and to produce and

permit inspection and copying of documents for use in proceedings pending before the English

High Court in London, England, namely Mohammed Al Amoudi v. Hussein Abdullah Kassim et

al. (Claim No. HC02C02379) and Mohammed Al Amoudi v. Hiwot Habte et al. (Claim No.

HC02C01245) (the "English proceedings"),  upon the declaration of Thomas H. Webster, Esq.,

dated June 23, 2003 and the exhibits attached thereto, and the accompanying memorandum of

law, in support thereof, it is hereby ordered that:

1.      Subpoenas shall be issued to the persons identified below commanding

their attendance at depositions to give oral testimony and the production of documents for
*provided such subpoenas are served at least two week before*
inspection and copying. The persons identified below shall produce such documents as are *their*
*respecti-*
*returnd*
described in the Exhibit corresponding to their name below. *so that*
*any objed*
*can be*
*raised i,*
*Part I*
*this Cou*

a.      Tigist Hailu (Ex. A);

   b.  Barclays PLC (Ex. B);

   c.  Credit Agricole Indosuez (Ex. C);

   d.  Merrill Lynch Pierce Fenner & Smith (Ex. D);

   e.  Deutsche Bank Trust Company Americas (Ex. E);

   f.  Citibank N.A. (Ex. F);

   g.  UBS AG (Ex. G);

   h.  Wells Fargo Bank (Ex. H);

  2.  Mr. Al Amoudi's New York counsel, Torys LLP, as officers, and on

behalf of the Court, may issue and sign such additional subpoenas to persons that reside or can

be found in this district as may be needed for discovery for use in the English Proceedings.

**SO ORDERED:**

_____
   U.S.D.J.
   PART I

Dated:  June _22_ 2003
     New York, New York

473615.2
32408-2001

2

RECEIVED
WILLIAM T WALSH, CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
2003 AUG -7 P 12: 01

UNITED STATES
DISTRICT COURT

**COLEMAN LAW FIRM**
Ronald D. Coleman (RC-3875)
David M. Nieporent (DN-9400)
881 Allwood Road
Clifton, New Jersey  07012
(973) 471-4010
Attorneys for Claimant
Mohammed Al Amoudi

# FILED

**AUG 0 7 2003**

Torys LLP
Steven R. Schoenfeld (SS 9181)
Rosena P. Rasalingam (RR 5716)
237 Park Avenue
New York, New York  10017
(212) 880-6000
Attorneys for Claimant
Mohammed Al Amoudi



AT 8:30_____M
WILLIAM T. WALSH
CLERK

IN THE MATTER OF THE
APPLICATION FOR DISCOVERY FOR
USE IN PROCEEDINGS BEFORE THE
ENGLISH HIGH COURT OF JUSTICE
BETWEEN MOHAMMED AL AMOUDI,

CLAIMANT,

- AND -

HUSSEIN ABDULLAH KASSIM ET
AL., DEFENDANTS, CLAIM Nos.
HC02C02379 and HC02C01245.

CIVIL ACTION NO. *Misc. No.*

**EX-PARTE ORDER FOR DISCOVERY**
**FOR USE IN ENGLISH HIGH COURT**
**PROCEEDINGS**

Upon  the  filing  of  an  ex-parte  application  by

Mohammed  Al  Amoudi  for  an  order,  pursuant  to  28  U.S.

1782  and  Rules  30  and  45  of  the  Federal  Rules  of

Procedure,  issuing  subpoenas  to  persons  residing  in

can be found in this judicial district that command those persons to appear at depositions upon oral examination and to produce and permit inspection and copying of documents for use in proceedings pending before the English High Court in London, England, namely <u>Mohammed Al Amoudi v. Hussein Abdullah Kassim et al</u>. (Claim No. HC02C02379) and <u>Mohammed Al Amoudi v. Hiwot Habte et al</u>. (Claim No. HC02C01245) (the "English proceedings"), upon the declaration of Thomas H. Webster, Esq., dated July 8, 2003 and the exhibits attached thereto, and the accompanying memorandum of law, in support thereof, it is hereby ordered that:

1. Subpoenas shall be issued to the persons identified below commanding their attendance at depositions to give oral testimony and the production of documents for inspection and copying provided such subpoenas are served at least two weeks before their respective return dates, so that any objections can be raised in this court. The persons identified below shall produce such documents as are described in the Exhibit corresponding to their name below.

    a.    PNC Bank (Ex. A); and

    b.    NCR Corporation (Ex. B).

2. Mr. Al Amoudi's New Jersey counsel, Coleman Law

2

Firm, as officers, and on behalf of the Court, may issue and sign such additional subpoenas to persons that reside or can be found in this district as may be needed for discovery for use in the English Proceedings.

It is on this ___7th___ day of _August_, 2003, **SO ORDERED**:

_____
U.S.D.J.

3